John M. Morrison
Scott Peterson
MORRISON SHERWOOD WILSON DEOLA PLLP
401 North Last Chance Gulch · P.O. Box 557
Helena, Montana 59624-0557
(406) 442-3261
(406) 443-7294 facsimile
john@mswdlaw.com
scott@mswdlaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| CHARLES M. BUTLER, III, on behalf of himself and all others similarly situated, and CHOLE BUTLER, <br><br> Plaintiffs, <br><br> v. <br><br> UNIFIED LIFE INSURANCE COMPANY, HEALTH PLANS INTERMEDIARIES HOLDINGS, LLC, D/B/A HEALTH INSURANCE INNOVATIONS, HEALTH INSURANCE INNOVATIONS, INC., ALLIED NATIONAL, INC., NATIONAL BROKERS OF AMERICA, INC., THE NATIONAL CONGRESS OF EMPLOYERS, INC., and DOES 1-10, <br><br> Defendants. | **Cause No. CV 17-50-BLG-SPW-TJC** <br><br><br> **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Come now the Plaintiffs, through counsel, and for their Complaint in the above-captioned matter allege as follows:

## SUMMARY OF CLAIM

1.      In February 2016, Plaintiff Charles Butler was sold health insurance that became effective on April 1. He paid monthly premiums faithfully, which were withdrawn directly from his checking account. In August 2016, he was diagnosed with testicular cancer and began incurring medical costs including surgery. In February 2017, he was diagnosed with metastasis to his lungs. Defendants did not pay any of his medical bills as required by the insurance policy. Then, on the last day of February, his coverage was terminated without the required notice, contrary to express representations, and in violation of the policy itself, leaving him uninsured with tens of thousands of dollars in overdue medical bills just as he was to begin chemotherapy. This treatment of Mr. Butler constitutes breach of contract, violation of the Unfair Claims Settlement Practices Act, fraudulent inducement, deceit, constructive fraud, negligent misrepresentation, and malice. The Defendants' conduct has also caused harm to Mr. Butler's wife, Chole, and, because it was done systematically and programmatically, constitutes a breach of contract with similarly situated policyholders who are members of the putative class described below.

## PARTIES

2.     Plaintiffs Charles and Chole Butler are husband and wife and citizens and residents of Richland County, State of Montana.

3.     Defendant Unified Life Insurance Company ("Unified Life") is a Texas corporation and insurance company with its principal offices in Kansas that is licensed to do business in the State of Montana. Unified Life underwrote and insured the risk associated with the health insurance policy that is at issue in this case. Upon information and belief, Unified Life contracted with the other named Defendants to market, sell, and administer the health insurance policy that is at issue in this case.

4.     Health Plan Intermediaries Holdings, LLC, D/B/A Health Insurance Innovations and Health Insurance Innovations, Inc. are related Delaware corporations with their principal offices in Florida that market health insurance policies and perform billing for health insurance companies under the name Health Insurance Innovations ("HII"). On information and belief, HII participated in marketing to Mr. Butler the health insurance policy that is at issue in this case, collected the monthly premiums from Mr. Butler's bank account, and coordinated the activity of the Defendants with respect to Mr. Butler's health insurance coverage. HII bills itself on its website as "a leading developer and administrator of affordable, web-based individual health insurance plans and ancillary products."

HII was previously licensed as an insurance producer by the State of Montana but its license has been suspended.[1]

5.     National Brokers of America, Inc. ("NBoA") is an Ohio corporation with its principal offices in Pennsylvania operating as an insurance brokerage firm that distributes health insurance products to consumers and sold Mr. Butler the health insurance policy that is at issue in this case. NBoA is not licensed as an insurance producer or administrator by the State of Montana.

6.     Allied National, Inc. ("Allied National") is a Missouri Corporation with its principal offices in Kansas that contracts as a third-party administrator to handle health insurance claims for Unified Life and was responsible for handling the claims of Mr. Butler that are at issue in this case.

7.     The National Congress of Employers, Inc. ("NCE") is a Delaware corporation that participates in the marketing of health insurance policies and, on information and belief, participated in the marketing of Mr. Butler's health insurance coverage.[2]

8.     Does 1 through 10 are parties presently unknown that were involved in the misrepresentations regarding the health insurance policy sold to Mr. Butler,

---

[1] HII is not accredited by the Better Business Bureau and has a BBB rating of "F." https://www.bbb.org/west-florida/business-reviews/health-insurance/health-insurance-innovations-in-tampa-fl-90072827.
[2] NCE is not accredited by the Better Business Bureau and has a BBB rating of "F." https://www.bbb.org/new-york-city/business-reviews/associations/the-national-congress-of-employers-inc-in-garden-city-ny-161160.

failure to timely pay any of Mr. Butler's claims and/or the decision to terminate and non-renew Mr. Butler's health insurance coverage without the required notice.

## JURISDICTION

9.      Jurisdiction in this Court is based on diversity of citizenship because the Plaintiffs are citizens of Montana, all Defendants are citizens of other states, and the amount in controversy exceeds $75,000 exclusive of interests and costs. 28 U.S.C. § 1332. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs; there are at least one hundred (100) class members; and at least two-thirds of the members of the putative class are citizens of a state other than Defendants.

## VENUE

10.      Venue is appropriate in the Billings Division because the Defendants sold health insurance to Plaintiff in this Division, wrongfully failed to pay medical expenses due under the policy in this Division, and wrongfully terminated Plaintiff Charles Butler's coverage in this Division.  28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

11.      Plaintiff Charles Butler is a 36-year-old truck driver.  Because he was changing jobs and going to work for a company that did not offer health insurance, his wife, Plaintiff Chole Butler, requested health insurance information, on

information and belief, through a website operated by HII. On or about February 27, 2016, Mr. Butler received a telephone call at his home from William Corchado who was, on information and belief, acting as an agent of NBoA and the other named Defendants. He sold Mr. Butler a Unified Life health insurance policy that he represented to have 80/20 coverage and a $5,000 deductible. He arranged for premium payments to be automatically withdrawn from Mr. Butler's Wells Fargo checking account. Mr. Corchado's Unified Life Agent Number was E705000013. His email was william@nboainc.com. The policy he sold to Mr. Butler was Unified Life's "Premiere" policy ("the Policy").

12.    Mr. Corchado did not tell Mr. Butler that the Policy was subject to cancellation or non-renewal if he got sick. Mr. Butler had no reason to believe that to be the case and he would not have bought the Policy if he knew or believed that to be true. Defendants and each of them, through Corchado, told Mr. Butler that the Policy provided major medical "Obamacare" health insurance coverage and would pay his medical bills, subject to the co-insurance and deductible terms. Mr. Corchado said higher priced "Obamacare" policies were "scams." Mr. Butler agreed to purchase the health insurance coverage from Defendants based on Mr. Corchado's representations. Mr. Butler did not fill out or sign an application form; rather, Defendants filled out the application for him, without showing it to him, and printed his "signature" on the form.  Mr. Corchado told Mr. Butler that the Policy would be covered by a network and did not disclose to Mr. Butler that

medical bills would be "discounted" for payment or that Mr. Butler would be subject to balance billing.

13.     Mr. Butler's coverage became effective April 1, 2016, with a termination date of February 28, 2017. Defendants did not provide Mr. Butler with a hard copy of the Policy but provided him only with a Unified Life Premiere health insurance card (the Card) with Member ID 100197170. The reverse side of the card stated that it was an NCE membership card, although Mr. Butler did not knowingly become a member of NCE, received no services of any kind from NCE, and did not know what NCE was. The reverse side of the insurance card also directed Mr. Butler to send claims to Allied National and to direct "billing & non-claims related questions" to HII.  The Card also stated the Mr. Butler had "network access" to the "MultiPlan Complementary Network." The Policy, which was available electronically via a web portal maintained by Defendants, included a Schedule of Benefits that referred to an "In Network" deductible as well as an "Out of Network" deductible. In fact, there was no network, which meant Mr. Butler, unbeknownst to him, was subject to balance billing by providers. This dramatically affected the value of the coverage under the Policy and rendered representations about the Policy deductible and co-insurance terms false and deceptive.

14.     In August 2016, Mr. Butler was diagnosed with testicular cancer. He underwent surgery at that time and received other medical care. The providers

submitted medical bills to Allied National, but Allied National did not pay the bills.

15.     On or about September 8, 2016, Mr. Butler's wife Chole called Allied National three times to ask why the medical bills were not being paid. Each time the phone rang indefinitely without being answered. Following his diagnoses, Mr. Butler received medical care from a dozen providers. None of their bills were paid.

16.     On or about October 24, 2016, Defendants mailed to Mr. Butler a letter asking him to identify, by name, address and telephone number, every doctor, hospital and other provider that he had seen or been recommended to see since April 1, 2011, five years prior to the effective date of his Policy. The letter did not disclose and Mr. Butler did not know that the purpose of the letter was to undertake a "Rescission Review" in order for Defendants to determine whether the Policy could be canceled so that Defendant Unified would have no obligation to pay any of Mr. Butler's medical expenses. This Rescission Review was triggered automatically by the proprietary computer system of Defendant Allied based only upon the diagnostic codes appearing on Mr. Butler's medical bills.

17.     On or about January 26, 2017, Mrs. Butler called Allied National regarding why none of Mr. Butler's medical bills had been paid. A representative told Mrs. Butler that Allied National was still missing records. Mrs. Butler then contacted the Great Falls Clinic, Esprit Health Clinic in Sidney, Montana, and

other providers who all advised that any records requested by Allied National had been forwarded to Allied National immediately.

18.   In February 2017 Mr. Butler was told that his testicular cancer had metastasized to his lungs and chemotherapy was ordered.

19.   On or about February 23, 2017, the Butlers received on their home answering machine a recorded message stating:

> My name is William. I'm giving you a call from Express Benefits Plus in regards to your current health insurance policy that you had through Health Insurance Innovations and Premier Health. Your policy is set to expire at the end of this week. You need to give us a call back as soon as possible to avoid any lapse in coverage. My number is 860-352-9199…. Please give us a call back as soon as possible to avoid any lapse in coverage.[3]

Mrs. Butler called William Corchado at NBoA and spoke with him that night. Mr. Corchado told Mrs. Butler (and through her, Mr. Butler) that he would personally make sure that the policy would be renewed on or before February 28, 2017, that Mr. Butler would be "grandfathered" in and "automatically renewed" for the same premium and that his automatic renewals would recur indefinitely. Mr. and Mrs. Butler were greatly relieved to hear this and justifiably believed and relied on Mr. Corchado's representation.

---

[3] On information and belief, Express Benefits Plus is a d/b/a for NBoA and Premier Health refers to the Unified Life health insurance "Premier" policy that HII markets and that was sold through NBoA to Mr. Butler.

20.    On information and belief, unbeknownst to Mr. and Mrs. Butler, without notice to or request of Mr. Butler, contrary to Montana law,[4] contrary to the policy language itself, and contrary to the express promises of William Corchado, Mr. Butler's policy lapsed and was not renewed as of February 28, 2017.

21.    On or about March 1, 2017, a representative of MD Anderson Cancer Treatment Center in Houston, Texas contacted Mr. Butler to tell him that they had contacted his insurance company and were advised that he no longer had health insurance and that MD Anderson therefore would be unable to further assist him. The same day, Mrs. Butler called NBoA again. She was told that William Corchado did not have the authority to renew Charles' coverage, that the coverage was not renewable and that she must contact HII. Mrs. Butler called NBoA two additional times attempting to speak to William Corchado but was not allowed to speak with him. Two different assistants advised Mrs. Butler that NBoA had stopped working with HII in the summer of 2016 and that she must contact HII directly. Mrs. Butler asked that William Corchado call her back, but the return call never came.

22.    Mr. Butler began chemotherapy under the supervision of the Billings Clinic at the Sidney Health Care Cancer Wing but had no health insurance

---

[4] Non-renewal of a disability (health) insurance policy requires 90 days notice unless for non-payment of premium or misrepresentation.  Section 33-22-121, MCA.

coverage during the month of March and the bills for his life-saving medical care mounted.[5]

23.   Because of Defendants' failure to pay Mr. Butler's medical bills for many months, Butlers filed a complaint with the Montana Insurance Department, which forwarded the complaint to Unified Life. Unified Life received it on or about March 6, 2017.

24.   Also in early March 2017, Butlers consulted the undersigned legal counsel John Morrison. Morrison contacted NBoA on or about March 9 and asked for an explanation of why Mr. Butler's coverage was non-renewed without notice and contrary to Corchado's representation and why none of the medical bills had been paid. About one week later, Allied National began issuing Explanations of Benefits (EOBs) excluding certain charges, steeply discounting other billed charges, charging the discounted amounts against the $5,000 deductible, and then paying certain discounted charges after the deductible, subject to the 20% co-insurance. Other bills remain unpaid and have yet to be addressed in any EOB.

25.   As mentioned above, the insurance card issued to Mr. Butler stated that his coverage is provided "**Network Access**" within the MultiPlan Complementary Network. In a network, the patient is protected from balance billing by the provider. However, on information and belief, the discounting applied by Allied National to Mr. Butler is not provided by any networking

---

[5] Butlers were able in March to secure coverage through Healthcare.gov with Health Care Service Corporation d/b/a Blue Cross Blue Shield of Montana, effective April 1, 2017.

agreement with providers but by a pricing guide called Data iSight, which Allied National relies on for its determination of "usual and customary" charges. For example, Allied National discounted a general anesthesia charge of $1,026.00 to $258.11. This discount prolonged Mr. Butler's $5,000 deductible by allowing only $258.11 to be charged against it, even though he was responsible for the full charge. Once the allowed charges finally reached the level of the deductible, Mr. Butler nevertheless continued to be exposed not only to his co-insurance percentage of the allowed charge but also to balance billing above the steeply discounted allowed charge. The Policy defines "Reasonable and Customary Charge" (on page 9) as "the usual charge made for necessary medical services, drugs, supplies, procedures or treatment generally furnished for cases of comparable severity and nature in the geographical area in which the services, drugs, supplies, procedures or treatment are furnished." While the policy states that Unified Life relies on "standard industry reference sources," the use of prices set by Data iSight was not disclosed to Mr. Butler, was contrary to representations made to Mr. Butler by Defendants and was contrary to the language of the Policy. In particular, the prices set by Data iSight and used by Defendants did not reflect the usual charge in the geographic area at all and was based on an algorithm that systematically set allowed charges that were far less than the usual charge in the geographic area. Thus, in addition to the failure to disclose the use of Data iSight, the prices of Data iSight were unreasonably, deceptively and fraudulently low and

did not reflect usual rates for the services in question as defined by the Policy or by any other reasonable standard.[6] The Policy also failed to comply with § 33-15-308, MCA, by containing no description of the database reasonably calculated to inform Mr. Butler (had he been given the Policy to read) of the method used to determine the usual charges in the geographic area and by containing no statement informing Mr. Butler that he would be subject to balance billing for the difference between the provider charge and the "reasonable and customary" charge.

26.    The Policy (on page 25) contains an "Extension of Benefits" clause, which provides that, if a covered sickness that commences during the policy period causes the policyholder to become totally disabled, policy benefits will continue until the disability ends. Mr. Butler became totally disabled by his cancer and associated treatment, was found to be totally disabled by his physician and qualified for AFLAC disability benefits based on his total disability, all in February 2017 before his Policy expired. Despite having months of medical bills showing Mr. Butler's treatment for cancer, which became metastatic, Defendants terminated Mr. Butler's coverage without taking any steps to determine if Mr. Butler was totally disabled for purposes of triggering Extension of Benefits under the policy and without even informing Mr. Butler of the Extension of Benefits provision of the Policy.

---

[6] The use of Data iSight pricing was found by the New York Attorney General in 2012 to be a fraudulent business act and deceptive business act or practice in violation of EL § 63(12) and GBL § 349(a).  http://www.catalystgroupconsultants.com/wp-content/uploads/2016/04/Tab_H.pdf at 4, ¶10.

27.    In addition to the loss of coverage benefits and other consequential economic damage, Mr. Butler has suffered severe emotional distress because of Defendants' conduct. Mr. Butler has experienced significant anger because of the Defendants dropping his coverage after he was told by William Corchado that the policy would be continued or "grandfathered in." Mr. Butler has felt frustration and mistrust that an insurance agent would lead him on and then not have the courage to talk to him or return phone calls or messages left for the insurance agent. He has had anger because he was forced to have to worry about this insurance issue while he was fighting a life-threatening disease (Cancer). He has experienced frustration at Defendants' lack of getting back to him regarding any of his medical claims or sending out EOBs until after April 2017. The continued worrying about the insurance situation caused him to become depressed and have increased anxiety. He was forced to seek treatment for the anxiety, on more than one occasion, from his regular medical provider, Michelle Frank. She prescribed and eventually increased his medication dosage. The Defendants' wrongful conduct described herein multiplied his sadness that already came with having a life-threatening disease and caused him to be embarrassed because he wasn't able to pay his medical bills in a timely manner. At a time when he should only have had to concentrate on beating Cancer, he was forced to go to the treatment center manager, Christabel Steinbeisser and explain that his insurance had dropped him, and he wouldn't be able to pay for his life-saving chemotherapy. Mr. Butler found

this to be very awkward to be at the mercy or generosity of someone (medical staff) because he had no way to pay for life-saving treatments. He has also gone through the fear of losing his home, belongings and vehicle because of these medical bills. This situation has caused stress and strain between himself and his spouse because of the medical bills, lack of income during his disability period while he was doing chemotherapy and the continual calling that had to be done with the insurance issues. Mr. Butler's personality and temperament has been affected by this experience, also adding to the marriage strain. He once was happy-go-lucky and now he is easily angered and mistrusting of any insurance agent and people in general. He now suffers from depression, which has been medically diagnosed. The change in his temperament has been noticed by his employer, clients, co-workers, friends, Pastor and especially his wife.

28.    The conduct of Defendants described herein also caused economic harm to Mrs. Butler and has made her life miserable and complicated causing severe emotional distress. Mrs. Butler handled most of the communications with the Defendants after Mr. Butler became ill. She repeatedly had to contact Defendant Allied to try to determine why the medical bills were not being paid. In February and March 2017, she was on the phone trying to contact William Corchado daily. His lack of response was frustrating because she was taking time away from her full-time job to keep making calls throughout the day. He wouldn't answer her calls and other Allied representatives gave vague replies with no real

answers. Each time she called back, she was routed to someone else and she suffered anger and anxiety as she continued to try to find out why the insurance had lapsed when Corchado had promised that it would not and when she and Mr. Butler had relied on his promises. When Mrs. Butler was told by MD Anderson Cancer Treatment Center that there was no insurance, she was traumatized and she worried and stressed at how her husband would get the life-saving treatment he needed. During this time, she has struggled with depression and anxiety and excessive worrying became a daily occurrence because of the lack of insurance during this Cancer crisis. Mrs. Butler had to seek medical attention from her health provider who provided her with depression and anxiety medications that have had to be adjusted up over this time period. Mrs. Butler is a quiet and reasonable person, easy to get along with and is willing to compromise. She has been dealing with anger regarding this situation and this has caused her to have chronic digestive problems. By June 2017, the worry and stress caused her blood pressure to become high and heart palpitations occurred causing her to be hospitalized in late June 2017. Previously, she has had low blood pressure and she is now on medication because of the stress that this situation has caused. Month after month of this struggle has caused Mrs. Butler to be fatigued and also unable to sleep at night. She is thinking and worrying about this insurance situation, tossing and turning in bed at night, going through the outcome over and over in her mind and wondering how these bills will be paid. The lack of rest has also led to severe neck

and muscle tension and daily headaches. Mrs. Butler is plagued by sadness and fear of losing their property and belongings because of the outstanding medical bills. She also worries about how this situation is affecting her husband as he continues to be tested for a Cancer reoccurrence. It has been humiliating and embarrassing for Mrs. Butler to talk to the medical providers, nurses, patient counselors and hospital billing departments, including having to tell them her husband had no insurance after February 2017 right when he needed the life-saving Cancer treatment. She was also very fearful that the health providers and facilities would turn Charles away from the treatment he needed so badly as MD Anderson in Texas had already done. She feels uncomfortable and ashamed that they are not able to pay their medical bills as they have done in the past. This situation has also caused tension, anger and irritability between Mrs. Butler and her husband. Their marriage has suffered because of the financial strain due to unpaid medical bills and lack of income during his disability period while he was doing chemo therapy, forcing them to seek counseling from local pastors and friends. Their marriage has also suffered because of the emotional strain of dealing with the Defendants' conduct, including the continual calling that had to be done with the insurance issues. Mr. Butler's' personality and temperament has been affected by this experience, also adding to the marriage strain. Mrs. Butler and her husband enjoyed a strong and loving marriage before the events described in this Complaint began; now, they have lost tenderness and affection that have been crushed by the

stress of dealing with the Defendants' duplicity regarding the insurance coverage and wrongful denials of claims.

## COUNT I
### BREACH OF CONTRACT

29.     Plaintiffs incorporate by reference all prior allegations.

30.     Mr. Butler had a health insurance contract with Unified Life by which Unified Life agreed to pay for Mr. Butler's medical expenses, subject to the 80/20 co-insurance and $5,000 deductible, and Mr. Butler agreed to allow Unified Life to withdraw premium payments every month out of his Wells Fargo checking account.

31.     Mr. Butler fully performed his part of the contract by paying his premiums in full and on time.

32.     Unified Life breached the contract by failing for months to pay for the medical bills that Mr. Butler incurred when he developed cancer and only commencing partial payment after being contacted and questioned by the undersigned legal counsel and the Montana Insurance Department.

33.     Unified Life breached the contract by discounting medical bills to amounts lower than the "Reasonable and Customary Charge" as defined in the policy, by failing to disclose to Mr. Butler the methodology behind their discounting, by failing to disclose to Mr. Butler that he would be subject to balance

billing by providers, by not providing a network and by exposing Mr. Butler to significant balance billing.

34.    Unified Life breached the contract by terminating coverage on February 28, 2017, without notice, contrary to the express representations of Mr. Corchado, and despite the fact that Mr. Butler had become totally disabled by his cancer and qualified for Extension of Benefits.

35.    As a direct and legal result of Unified Life's breaches of contract, Plaintiff Mr. Butler suffered the loss of his contract benefits, other consequential economic damages, attorney fees and costs.

### COUNT II
#### UNFAIR CLAIMS SETTLEMENT PRACTICES

36.    Plaintiffs incorporate by reference all prior allegations.

37.    Unified Life and the other Defendants are insurers within the meaning of §§ 33-18-242 and 33-1-201(6), MCA.

38.    By engaging in the conduct alleged herein, Defendants misrepresented pertinent facts and insurance policy provisions relating to Mr. Butler's health insurance, refused to pay claims without conducting a reasonable investigation based upon all available information, failed to affirm or deny coverage of claims within a reasonable time after proof of loss statements had been completed, and neglected to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear, in violation of

§ 33-18-201(1), (4), (5), and (6), MCA, the Montana Unfair Claims Settlement Practices Act (UCSPA).

39.    Defendants and each of them committed these tortious acts in concert with each other and pursuant to a common design with each other, knew that each other's conduct constituted a breach of duty and gave substantial assistance or encouragement to each other. Defendants and each of them further gave substantial assistance to each other in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

40.    As a direct and legal result of Defendants' violations of the UCSPA, Mr. Butler and Mrs. Butler have suffered and continue to suffer economic and non-economic damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium entitling them to the full measure of relief under § 33-18-242, MCA.

## COUNT III
### FRAUDULENT INDUCEMENT

41.    Plaintiffs incorporate by reference all prior allegations.

42.    NBoA and the other Defendants, acting through NBoA salesman William Corchado, during the telephone call he placed to Mr. Butler on or about February 27, 2016, induced Mr. Butler to purchase the policy by telling him that the Policy was a major medical "Obamacare" type policy and thereby leading him

to believe that it was compliant with the Affordable Care Act and by telling him the Policy was covered by a network.  Corchado deliberately concealed from Mr. Butler and Mrs. Butler that the Policy excluded preexisting conditions, would not be renewed at the end of the 11-month policy period if he became ill, would subject him to the ACA's penalty for not purchasing insurance, was not within MultiPlan or any other PPO network, and would pay only a portion of his medical bills leaving him with thousands of dollars in balance billed medical expenses. Corchado's representation that this was an "Obamacare" type policy was material and false and NBoA and the other Defendants knew it was material and false. The facts concealed by Corchado were also material facts which NBoA and the other Defendants knew were material and knew were being concealed by NBoA.

43.    Mr. Butler and Mrs. Butler did not know the aforedescribed representations by Mr. Corchado and the Defendants were false or of the concealed material facts, and he justifiably relied on the information given to him by Corchado and the Defendants as being true and accurate. Mr. Butler and Mrs. Butler were not shown the Policy or even his signature page, which was filled out by NBoA, Mr. Butler and Mrs. Butler have no education or experience in health insurance, and Mr. Corchado held himself out as a knowledgeable and skilled insurance professional. Further, the insurance card sent to Mr. Butler confirmed that he was covered by the MultiPlan network (and therefore would not be subject to balance billing). As a direct and legal result of the fraudulent inducement and

Mr. and Mrs. Butler's justifiable and rightful reliance on the misrepresentations, they suffered economic and non-economic damages, including severe emotional distress, because they were left with thousands of dollars of medical bills including bills incurred when his insurance coverage was terminated and was not renewed just as he was to begin chemotherapy and Mrs. Butler has suffered a loss of consortium.

44.     Defendants and each of them committed these tortious acts in concert with NBoA and pursuant to a common design with NBoA, knew that NBoA's conduct constituted a breach of duty and gave substantial assistance or encouragement to NBoA so to conduct itself. Defendants and each of them further gave substantial assistance to NBoA in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

45.     As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT IV
### DECEIT

46.     Plaintiffs incorporate by reference all prior allegations.

47.    NBoA and the other Defendants, acting through NBoA salesman William Corchado, during the telephone call he placed to Mr. Butler on or about February 27, 2016, induced Mr. Butler to purchase the policy by telling him that the Policy was a major medical "Obamacare" type policy and thereby leading him to believe that it was compliant with the Affordable Care Act and by telling him the Policy was covered by a network.  Corchado deliberately concealed from Mr. Butler and Mrs. Butler that the Policy excluded preexisting conditions, would not be renewed at the end of the 11-month policy period if he became ill, would subject him to the ACA's penalty for not purchasing insurance, was not within MultiPlan or any other PPO network, and would pay only a portion of his medical bills leaving him with thousands of dollars in balance billed medical expenses. Corchado's representation that this was an "Obamacare" type policy was material and false and NBoA and the other Defendants knew it was material and false. The facts concealed by Corchado were also material facts which NBoA and the other Defendants knew were material and knew were being concealed by NBoA.

48.    Mr. Butler and Mrs. Butler did not know the aforedescribed representations by NBoA about the health insurance coverage he was being sold were false or of the concealed material facts and justifiably relied on the information given to him by NBoA as being true and accurate. Mr. Butler and Mrs. Butler were not provided with a copy of the Policy or even his signature page, which was filled out by NBoA, Mr. Butler and Mrs. Butler have no education or

experience in health insurance, and Mr. Corchado held himself out as a knowledgeable, skilled insurance professional. Further, the insurance card sent to Mr. Butler confirmed that he was covered by the MultiPlan network (and therefore would not be subject to balance billing.) As a direct and legal result of the deceit and Mr. Butler's and Mrs. Butler's justifiable and rightful reliance on the deceitful misrepresentations, they suffered economic and non-economic damages, including severe emotional distress, because he was left with thousands of dollars of medical bills and his insurance coverage terminated and was not renewed just as he was to begin chemotherapy and Mrs. Butler has suffered a loss of consortium.

49.     NBoA and the other Defendants, acting through NBoA salesman William Corchado, during a telephone call on or about February 23, 2017, told Mrs. Butler (and through her Mr. Butler) that he would ensure that the Butler's coverage did not lapse, that they would be automatically renewed without a premium increase, that there would be no gap in coverage, that Mr. Butler's cancer condition would be "grandfathered in," and that Mr. Butler's Policy would be renewed each year, all of which statements were material and false and which NBoA and the other Defendants knew were material and false.

50.     Mr. Butler and Mrs. Butler did not know the aforedescribed representations by NBoA about renewal of his coverage were false and justifiably relied on the information given to him by NBoA as being true and accurate. Mr. Corchado had sold the Policy to Mr. Butler and Mr. Butler and Mrs. Butler

believed that he could be trusted as an insurance agent. Mr. Butler and Mrs. Butler had never seen the Policy or even his signature page, which was filled out by NBoA, Mr. Butler and Mrs. Butler have no education or experience in health insurance, Mr. Corchado held himself out as a knowledgeable and skilled insurance professional and Mr. Butler and Mrs. Butler had seen news reports leading them to believe that Mr. Corchado's representations were consistent with the ACA. Mr. Butler and Mrs. Butler were further justified in believing Mr. Corchado because of the above-quoted telephone message that Corchado left on the answering machine of Butlers earlier that day stating that they should call him to avoid a lapse in coverage. As a direct and legal result of the deceit and Mr. Butler's and Mrs. Butler's justifiable and rightful reliance on the deceitful misrepresentations, they suffered economic and non-economic damages, including severe emotional distress, because his insurance coverage terminated and was not renewed just as he was to begin chemotherapy and Mrs. Butler has suffered a loss of consortium.

51.    Defendants committed these tortious acts in concert with NBoA and pursuant to a common design with NBoA, knew that NBoA's conduct constituted a breach of duty and gave substantial assistance or encouragement to NBoA so to conduct itself. Defendants and each of them further gave substantial assistance to NBoA in accomplishing a tortious result and the conduct of each of them,

separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

52.    As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

**COUNT V**
**CONSTRUCTIVE FRAUD**

53.    Plaintiffs incorporate by reference all prior allegations.

54.    NBoA and the other Defendants, acting through NBoA salesman William Corchado, during the telephone call he placed to Mr. Butler on or about February 27, 2016, induced Mr. Butler to purchase the policy by telling him that the Policy was a major medical "Obamacare" type policy and thereby leading him to believe that it was compliant with the Affordable Care Act and by telling him the Policy was covered by a network.  Corchado deliberately concealed from Mr. Butler and Mrs. Butler that the Policy excluded preexisting conditions, would not be renewed at the end of the 11-month policy period if he became ill, would subject him to the ACA's penalty for not purchasing insurance, was not within MultiPlan or any other PPO network, and would pay only a portion of his medical bills leaving him with thousands of dollars in balance billed medical expenses. Corchado's representation that this was an "Obamacare" type policy was material

and false and NBoA and the other Defendants knew it was material and false. The facts concealed by Corchado were also material facts which NBoA and the other Defendants knew were material and knew were being concealed by NBoA.

55.    Mr.  Butler  Mrs.  Butler  did  not  know  the  aforedescribed representations by NBoA about the health insurance coverage he was being sold were  false  or  of  the  concealed  material  facts  and  justifiably  relied  on  the information given to him by NBoA as being true and accurate. Mr. Butler and Mrs. Butler were not provided with a copy of the Policy or even his signature page, which was filled out by NBoA, Mr. Butler and Mrs. Butler have no education or experience  in  health  insurance,  and  Mr.  Corchado  held  himself  out  as  a knowledgeable and skilled insurance professional. Further, the insurance card sent to Mr. Butler confirmed that he was covered by the MultiPlan network (and therefore would not be subject to balance billing.) As a direct and legal result of the constructive fraud and Mr. Butler's and Mrs. Butler's justifiable and rightful reliance  on  the  misrepresentations,  they  suffered  economic  and  non-economic damages,  including  severe  emotional  distress,  because  they  were  left  with thousands of dollars of medical bills and his insurance coverage terminated and was not renewed just as he was to begin chemotherapy and Mrs. Butler has suffered a loss of consortium.

56.    NBoA and the other Defendants, acting through NBoA salesman William Corchado, during a telephone call on or about February 23, 2017, told

Mrs. Butler (and through her Mr. Butler) that he would ensure that the Butler's coverage did not lapse, that they would be automatically renewed without a premium increase, that there would be no gap in coverage, that Mr. Butler's cancer condition would be "grandfathered in," and that Mr. Butler's would be renewed each year, all of which statements were material and false.

57.    Mr. Butler and Mrs. Butler did not know the aforedescribed representations by NBoA and the other Defendants about renewal of his coverage were false and justifiably relied on the information given to him by NBoA as being true and accurate. Mr. Corchado had sold the Policy to Mr. Butler and Mr. Butler and Mrs. Butler believed that he could be trusted as an insurance agent. Mr. Butler and Mrs. Butler had never seen the Policy or even his signature page, which was filled out by NBoA, Mr. Butler and Mrs. Butler have no education or experience in health insurance, and Mr. Corchado held himself out as a knowledgeable insurance professional. Mr. Butler and Mrs. Butler also had seen news reports leading them to believe that Mr. Corchado's representations were consistent with the ACA. Mr. Butler and Mrs. Butler were further justified in believing Mr. Corchado because of the above-quoted telephone message that Corchado left on the answering machine of Butlers earlier that day stating that they should call him to avoid a lapse in coverage. As a direct and legal result of the deceit and Mr. Butler's and Mrs. Butler's justifiable and rightful reliance on the misrepresentations, they suffered economic and non-economic damages, including severe emotional distress,

because his insurance coverage terminated and was not renewed just as he was to begin chemotherapy and Mrs. Butler has suffered a loss of consortium.

58.    Defendants committed these tortious acts in concert with NBoA and pursuant to a common design with NBoA, knew that NBoA's conduct constituted a breach of duty and gave substantial assistance or encouragement to NBoA so to conduct itself. Defendants and each of them further gave substantial assistance to NBoA in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

59.    As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT VI
### NEGLIGENT MISREPRESENTATION

60.    Plaintiffs incorporate by reference all prior allegations.

61.    The aforedescribed representations by Defendant NBoA and the other Defendants constituted negligent misrepresentation.

62.    As a direct and legal result of Defendants' negligent misrepresentation, Mr. Butler and Mrs. Butler suffered significant economic and

non-economic injuries and damages, including severe emotional distress, and Mrs.
Butler has suffered a loss of consortium.

63.    Defendants committed these tortious acts in concert with NBoA and
pursuant to a common design with NBoA, knew that NBoA's conduct constituted a
breach of duty and gave substantial assistance or encouragement to NBoA so to
conduct itself. Defendants and each of them further gave substantial assistance to
NBoA in accomplishing a tortious result and the conduct of each of them,
separately considered, constitutes a breach of duty to Mr. Butler and to Mrs.
Butler.

64.    As a direct and legal result of the Defendants' joint tortious conduct,
Mr. Butler suffered significant economic and non-economic injuries and damages,
including severe emotional distress, and Mrs. Butler has suffered a loss of
consortium.

## COUNT VII
### BREACH OF INSURANCE AGENT ABSOLUTE DUTY

65.    Plaintiffs incorporate by reference all prior allegations.

66.    In the telephone conversations between Mr. Corchado and Mr. Butler
on or about February 27, 2016 and the telephone conversation on or about
February 23, 2017, NBoA failed to procure specific insurance that Mr. Corchado
was instructed to procure and promised that he would procure and NBoA thereby
violated its absolute duty to procure such insurance.

67.     As a direct and legal result of NBoA's breach of absolute duty, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

68.     Defendants committed these tortious acts in concert with NBoA and pursuant to a common design with NBoA, knew that NBoA's conduct constituted a breach of duty and gave substantial assistance or encouragement to NBoA so to conduct itself. Defendants and each of them further gave substantial assistance to NBoA in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. and Mrs. Butler.

69.     As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT VIII
### PROMISSORY ESTOPPEL

70.     Plaintiffs incorporate by reference all prior allegations.

71.     NBoA and the other Defendants made promises that were clear and unambiguous in their terms. To wit: During the call on or about February 27, 2016, that the Policy was a major medical "Obamacare" policy that was compliant with the Affordable Care Act, and by virtue of his concealment of these material facts,

that the Policy did not exclude preexisting conditions, could be renewed, would be within the MultiPlan network (and therefore not subject to balance billing), and would allow him to avoid paying the ACA's penalty for not purchasing insurance; and during the call on or about February 23, 2017, that NBoA would ensure that the Butler's coverage did not lapse, that it would be automatically renewed without a premium increase, that there would be no gap in coverage, that Mr. Butler's cancer condition would be "grandfathered in," and that Mr. Butler's policy would be renewed each year.

72.   Mr. Butler relied on the promises in the call on or about February 27, 2016, in his decision to purchase the Policy. Mr. Butler relied on the promises in the call on or about February 23, 2017, in believing that he had coverage for his upcoming treatment and in not obtaining other coverage.

73.   It was reasonable and foreseeable to Defendants that Mr. Butler would rely on the promises made in the 2016 call because Mr. Butler has no education or experience in health insurance, and Mr. Corchado held himself out as a knowledgeable and skilled insurance professional, Mr. Butler was not provided with a copy of the Policy or even his signature page, which was filled out by NBoA, and the insurance card sent to Mr. Butler confirmed that he was covered by the MultiPlan network (and therefore would not be subject to balance billing.) It was reasonable and foreseeable to Defendants that Mr. Butler would rely on the promises made in the 2017 call because Mr. Corchado had sold the Policy to Mr.

Butler and Mr. Butler believed that he could be trusted as an insurance agent, Mr. Butler had never seen the Policy or even his signature page, which was filled out by NBoA, Mr. Butler has no education or experience in health insurance, Mr. Corchado held himself out as a knowledgeable insurance professional and Mr. Butler had seen news reports leading him to believe that Mr. Corchado's representations were consistent with the ACA. Mr. Butler was further justified in believing Mr. Corchado because of the above-quoted telephone message that Corchado left on the answering machine of Butlers earlier that day stating that they should call him to avoid a lapse in coverage.

74.     As a result of his reliance on these promises of Defendants, Mr. Butler was injured, incurring significant uncovered medical expenses, and Defendants should therefore be estopped from denying coverage for those expenses.

## COUNT IX
### EQUITABLE ESTOPPEL

75.     Plaintiffs incorporate by reference all prior allegations.

76.     The representations made by Defendants in the 2016 and 2017 calls, the insurance card sent to Mr. Butler, the HII website, and other communications constitute conduct, acts, language, or silence amounting to a representation that the health insurance sold to Mr. Butler was major medical "Obamacare" health insurance. Defendants concealed material facts including that the Policy would be automatically canceled without notice, that bills would go unpaid for months, that

Mr. Butler was not in a MultiPlan provider network that protected him from balance billing, that Defendants would apply steep discounts to the medical bills submitted by providers and expose him to tens of thousands of dollars of balance billing and that Mr. Butler would be penalized under the ACA for not having adequate insurance. Defendants also concealed and failed disclose to Mr. Butler the database used to determine allowable charges and the fact that he would be balance billed by the providers, both of which are required by § 33-15-308, MCA. Defendants knew these facts at the time the representations were made and the material facts concealed or the circumstances were such that knowledge of these facts is necessarily imputed to them. However, the truth concerning these facts was unknown to Mr. Butler at the time they were acted upon by him. Defendants engaged in such conduct with the intention, or at least the expectation, that it would be acted upon by Mr. Butler, or under circumstances both natural and probable that it will be so acted upon. Mr. Butler did rely on Defendants' conduct (misrepresentation and concealment) and was led to act upon it in such a manner as to change his position for the worse as described in detail above, and Defendants should therefore be estopped from denying coverage for those expenses.

## COUNT X
### COMMON LAW BAD FAITH-ALTERNATIVE CLAIM HANDLING COUNT

77.    Plaintiffs incorporate by reference all prior allegations.

78.    To the extent Defendants other than Unified and Allied should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, Defendants' actions in the handling of Mr. Butler's claims constitute bad faith under the common law of Montana.

79.    As a direct and legal result of such Defendant's bad faith, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

80.    Defendants committed these tortious claim handling acts in concert and pursuant to a common design, knew that Allied National's claim handling conduct constituted a breach of duty and gave substantial assistance or encouragement to Allied National so to conduct itself. Defendants found not to be an insurer and each of them further gave substantial assistance to Allied National in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

81.    As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT XI
### NEGLIGENCE-ALTERNATIVE CLAIM HANDLING COUNT

82.     Plaintiffs incorporate by reference all prior allegations.

83.     To the extent Defendants other than Unified and Allied should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, Defendants' actions in the handling of Mr. Butler's claims constitute negligence under the common law of Montana.

84.     As a direct and legal result of such Defendants' negligence, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

85.     Defendants committed these tortious claim handling acts in concert and pursuant to a common design, knew that Allied National's claim handling conduct constituted a breach of duty and gave substantial assistance or encouragement to Allied National so to conduct itself. Defendants found not to be an insurer and each of them further gave substantial assistance to Allied National in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

86.     As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## **COUNT XII**

### NEGLIGENCE *PER SE*-ALTERNATIVE CLAIM HANDLING COUNT

87.    Plaintiffs incorporate by reference all prior allegations.

88.    To the extent Defendants other than Allied and Unified should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, Defendants' actions in the handling of Mr. Butler's claims constitute negligence *per se* in violation of subsections of § 33-18-201, MCA, and under the common law of Montana.

89.    As a direct and legal result of the negligence *per se* of such Defendants, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

90.    Defendants committed these tortious claim handling acts in concert and pursuant to a common design, knew that Allied National's claim handling conduct constituted a breach of duty and gave substantial assistance or encouragement to Allied National so to conduct itself. Defendants and each of them further gave substantial assistance to Allied National in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. Butler and to Mrs. Butler.

91.    As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic

injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT XIII
### BREACH OF FIDUCIARY DUTY-ALTERNATIVE CLAIM HANDLING COUNT

92.     Plaintiffs incorporate by reference all prior allegations.

93.     To the extent Defendants other than Unified and Allied should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, Defendants were in a fiduciary relationship with Mr. Butler and Mrs. Butler and their actions in the handling of Mr. Butler's claims constitute breach of fiduciary duty under the common law of Montana.

94.     As a direct and legal result of such Defendants' breach of fiduciary duty, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

95.     Defendants committed these tortious claim handling acts in concert and pursuant to a common design, knew that Allied National's claim handling conduct constituted a breach of duty and gave substantial assistance or encouragement to Allied National so to conduct itself. Defendants found not to be an insurer and each of them further gave substantial assistance to Allied National in accomplishing a tortious result and the conduct of each of them, separately considered, constitutes a breach of duty to Mr. and Mrs. Butler.

96.     As a direct and legal result of the Defendants' joint tortious conduct, Mr. Butler and Mrs. Butler suffered significant economic and non-economic injuries and damages, including severe emotional distress, and Mrs. Butler has suffered a loss of consortium.

## COUNT XIV
### MALICE

97.     Plaintiffs incorporate by reference all prior allegations.

98.     The conduct of Defendants and each of them as described above constitutes actual fraud and actual malice within the meaning of § 27-1-221, MCA, entitling Plaintiffs to punitive damages for the sake of example and for the purpose of punishing the Defendants.

## COUNT XV
### CLASS ACTION ALLEGATIONS
### AGAINST UNIFIED LIFE ONLY

99.     The claims in this Count seeking declaratory and injunctive relief on behalf of described policyholders of Unified Life are brought and may properly be maintained as a class action pursuant to Rule 23(b)(2) or alternatively Rule 23(b)(3) or Rule 23(c)(4) of the Federal Rules of Civil Procedure.  Plaintiff Charles Butler (Plaintiff) brings the claims in this Count on behalf of himself and others similarly situated (Class Members).  The proposed class is defined as:

> All individuals who have purchased the Unified Life Insurance Company Short Term Medical Insurance Policy, who have paid their premiums and who have made one or more claims that were paid based on an allowable charge amount that was less than the

Reasonable and Customary Charge that is defined in the Policy as "the usual charge" in the geographic area and/or who were not afforded promised network protections against balance billing within the applicable statutory period of limitations for written contracts.

The class includes policyholders covered under the Policy attached hereto as Exhibit A and policyholders covered under other Unified STM policies that have similar language that defines Reasonable and Customary Charges as "the usual charge" in the geographic area, but whose claims were determined and/or paid at less than the usual charge in the geographic area. The class also includes policyholders whose policy, like Exhibit A hereto, refers to a "Network" and/or has received an insurance card identical or similar to the Card attached hereto as Exhibit B—showing that the coverage includes network access--when there was no network associated with their Policy and who were therefore exposed to balance billing when they submitted claims.

100.   Plaintiff reserves the right to amend or modify the class definition in connection with a motion for class certification or as warranted by discovery.

101.   Numerosity:  Plaintiff does not know the exact size or identities of the proposed Class. However, Plaintiff believes that the Class encompasses thousands of individuals who are disbursed geographically throughout the United States. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.   The Class is ascertainable by Defendants' records, and Class Members may be notified of the pendency of this action by mail and/or electronic mail, supplemented if deemed necessary or appropriate by the Court by published notice.

102.   Common questions of fact and law:  There are questions of law and fact that are common to the class, and, if class certification is addressed under Rule

23(b)(3), these questions predominate over questions, if any, affecting only individual members of the class. The wrongdoing perpetrated upon Plaintiff and other Class Members as alleged in this class claim flow from a common nucleus of operative facts surrounding Defendants' misconduct which are actions or failures to act that apply generally to the class. The common questions present questions of the rights and legal relations arising under the insurance policy contracts such that declaration of the meaning and application of the contracts is appropriately addressed by declaratory ruling under 28 USC §2201. These common issues include, but are not limited to the following:

a.      Whether Unified Life, directly or through its agents, contractually promised to pay Plaintiff and other Class Members benefits based on Reasonable and Customary Charges defined as "the usual charge" in the geographic area;

b.      Whether Unified Life, directly or through its agents, breached its contracts with Plaintiff and other Class Members by systematically paying benefits based upon a "repricing" of submitted medical expenses at levels less than "the usual charge" in the geographic area;

c.      Whether Unified Life, directly or through its agents, systematically promised Plaintiff and other Class Members that their policy included network access which would protect them from balance billing;

d.     Whether Unified Life, directly or through its agents, systematically breached its contracts with Plaintiff and other Class Members by failing to provide network access and protect the policyholders from balance billing;

e.     Whether Plaintiff and other Class Members are entitled to a declaration by the Court that Defendant Unified Life is in breach of its contracts with Plaintiff and other Class Members through its program of systematically determining and paying benefits under the Policy based on an allowable charge that was less than "the usual charge" in the geographic area and to injunctive relief requiring Defendant Unified Life to recalculate benefits due to Plaintiff and other Class Members based on the "the usual charge" in the geographic area;

f.     Whether Plaintiff and other Class Members are entitled to a declaration by the Court that Defendant Unified Life is in breach of its contracts with Plaintiff and other Class Members by promising and not delivering network protection and to injunctive and supplementary relief requiring Defendant Unified Life to protect Plaintiff and other Class Members and hold them harmless from balance billing as if they were covered by a network as promised to them;

g.     Whether Plaintiff and other Class Members are entitled to injunctive relief prohibiting Defendant Unified Life from continuing to fail to pay the contractual benefits and from continuing to expose Plaintiff and the other Class Members to balance billing.

103.   Typicality:  Plaintiff's claims are typical of the Class claims, because Plaintiff and other Class Members all sustained losses arising out of essentially identical insurance policy terms and promises and a program of systematic claim handling under the contract that constitutes breaches of contract under the contract law of all states and jurisdictions, because Plaintiff and other Class Members have a similar interest in obtaining the declarations and injunctive relief sought herein, and because the Plaintiff and other Class Members have an interest in preventing Defendants from continuing to engage such programmatic activity.  Further, the Plaintiff's claim for declaratory relief and enforcement of the contract is representative of all Class Members because the Plaintiff and all Class Members have substantially identical relevant contract terms and promises and were all subject to the identical programmatic application of the policies in the "network" and the "usual charge" breaches described in this class claim.

104.   Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other class members in the maintenance of this class action.  Plaintiff has no relationship with Defendants except as a policyholder who entered into a contract with Defendant Unified Life. Plaintiff will vigorously pursue the claims of the Class.

105.   Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all

members is impracticable.    Furthermore, because the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class Members to individually seek redress for the wrongs done to them.  Plaintiff believes that many if not most Class Members, to the extent they are aware of their rights against Defendant Unified Life at all, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual losses, and that a class action is the only feasible means of recovery for many if not most of the Class Members.  Individual actions also would present a substantial risk of inconsistent decision, even though each Class Member has an identical or substantially similar claim or right against Defendant Unified Life.  Plaintiff envisions no difficulty in the management of this action as a class action.

106.   In the alternative, the Class may be certified because:

a.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members which would establish incompatible standards of conduct for Defendant Unified Life;

b.    The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede the ability to protect their

interests; and Defendant Unified Life has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

## CLASS CLAIMS FOR RELIEF

### COUNT I
#### BREACH OF CONTRACT

107.   Plaintiff realleges each of the allegations above and below as if fully set forth here.

108.   The substantially identical policy terms and promises in policies that Defendant Unified Life, directly or through its agents, sold Plaintiff and other Class Members and insurance cards Unified Life distributed to Plaintiff and other Class Members, combined with the timely payment of premiums by Plaintiff and other Class Members, contained legally enforceable promises and obligations owed via contract.

109.   By contracting with and accepting the premium payments from Plaintiff and other Class Members, Defendant Unified Life agreed to timely process, reasonably investigate, and pay claims amounts for certain medical expenses according to the terms of the Policy.

110.   The substantially identical representations of Defendant Unified Life, directly or through its agents, in the sale process and on the insurance card, as well as in the Policy, that the Plaintiff and other Class Members would be covered by a

network and therefore protected from balance billing, were promises that were part of the insurance contracts between Defendant Unified Life and Plaintiff and between Defendant Unified Life and each of the other Class Members.

111.   The representations by Unified Life, directly or through its agents, that Defendant Unified would pay benefits for medical expenses based upon Reasonable and Customary Charges being defined as "the usual charge" in the geographic area, constituted promises that are part of the contracts between Defendant Unified Life and the Plaintiff and each of the other Class Members.

112.   By systematically "discounting" allowed charges at levels significantly below "the usual charge" in the geographic area, Defendant Unified Life, directly or through its agents, breached its contracts with Plaintiff and other Class Members.

113.   By systematically failing to provide a network that protected Plaintiff and Class Members from balance billing and by exposing the Plaintiffs to balance billing, Defendant Unified Life, directly or through its agents, breached its contracts with Plaintiff and other Class Members.

114.   Defendant Unified Life's breaches caused and continue to cause losses to Plaintiff and other Class Members including but not limited to:

a.   The difference between "the usual charge" in the geographic area and the allowed charge shown on the EOBs, representing the systematic underpayment of medical expenses at levels below the amounts promised in the policy;

b.     The "discounted" amounts shown on Explanations of Benefits (EOBs) representing the difference between the charge submitted by the provider and the allowed charge, which difference was subject to balance billing because there was no network;

115.   As a direct and legal result of Defendant Unified Life's breaches of contract, Plaintiff and each Class Member are entitled to declaratory, supplemental, equitable and injunctive relief prayed for in this complaint.

116.   Plaintiff and Class Members are entitled to a declaration that Defendant Unified Life, directly or through its agents, contractually promised to determine Reasonable and Customary Charges under the terms of the Policy based on "the usual charge" in the geographic area as opposed to some lower allowable charge calculated by a "repricing" company, and that Defendant Unified Life has breached that contract. Further, Plaintiff and Class Members are entitled to a declaration that Defendant Unified Life, directly or through its agents, contractually promised to provide Plaintiff and Class Members a network, which would protect them from balance billing, and that Defendant Unified Life breached that contract.

117.   Plaintiff and Class Members are entitled to injunctive relief ordering Unified Life to process their claims based on Reasonable and Customary Charges being defined as "the usual charge" in the geographic area or in such *greater* amount as may be necessary to ensure that Plaintiff and Class Members are

protected from balance billing and to stop denying claims of class members until they are processed in this manner consistent with the terms of the contract.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs Charles and Chole Butler respectfully request the following relief against Defendants:

### FOR CHARLES AND/OR CHOLE BUTLER

a.      For payment of all Mr. Butler's medical expenses as billed by his providers;

b.      For consequential economic losses;

c.      For non-economic damages, including for emotional distress;

d.      For attorney fees;

e.      For prejudgment interest and post judgment interest in the amounts permitted by law;

f.      For punitive damages; and

g.      For costs of suit and such other and further relief as this Court may deem just and proper.

### FOR MEMBERS OF THE CLASS

a.      For an order certifying the case as a class action and appointing Plaintiff and Plaintiff's counsel to represent the class;

b.      For a declaration that the Policy contracts require Defendant Unified Life to pay claims based on Reasonable and Customary Charge being defined as

"the usual charge" in the geographic area, and that Defendant Unified Life has breached its Policy contracts with Plaintiff and the other Class Members by systematically paying claims based on allowed charges that are less than the usual charge in the geographic area;

c.     For a declaration that Defendant Unified is contractually obligated to protect Plaintiff and other Class Members from balance billing based on promises that the policyholders were covered under a network and that Defendant Unified Life breached its contracts with Plaintiff and the other Class Members by providing no network and exposing Plaintiff and the other Class Members to balance billing;

d.     For an Order enjoining Defendant Unified Life from the denial and withholding of claim benefits until such time as the claims of Plaintiff and Class Members are calculated based on Reasonable and Customary Charges being defined as "the usual charge" in the geographic area and compelling Defendant Unified Life to process claims of Plaintiff and Class Members based on those amounts or in such *greater* amount as may be necessary to ensure that Plaintiff and Class Members are protected from or reimbursed for balance billing;

e.     For an injunctive Order prohibiting Defendant Unified Life from continuing to engage in the described breaches of contract;

f.     For an Order awarding attorney fees and costs;

g.     For an Order awarding pre-judgment and post-judgment interest; and

h.    For an Order providing such further relief under 28 USC §2202 as the Court deems just and proper to enforce and remedy the breaches of contract described in the class claim.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38, F. R. Civ. P., the Plaintiffs hereby demand a trial by jury of the issues triable by right by jury.

DATED this 3rd day of December, 2018.

By:   /s/ John M. Morrison
John M. Morrison
MORRISON SHERWOOD WILSON DEOLA PLLP
*Attorney for Plaintiffs*