IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES M. BUTLER, III and CHOLE BUTLER | CV 17-50-BLG-SPW-TJC |
| Plaintiffs, | |
| vs. | **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| UNIFIED LIFE INSURANCE COMPANY; HEALTH PLANS INTERMEDIARIES HOLDINGS, LLC, doing business as Health Insurance Innovations, doing business as Health Insurance Innovations, Inc.; ALLIED NATIONAL, INC.; NATIONAL BROKERS OF AMERICA, INC.; THE NATIONAL CONGRESS OF EMPLOYERS, INC.; and DOES 1-10 | |
| Defendants. | |

Plaintiffs Charles M. Butler, III and Chole Butler ("Plaintiffs") bring this action against Defendants Unified Life Insurance Company ("Unified"), Health Plan Intermediaries Holdings, LLC d/b/a Health Insurance Innovations, d/b/a Health Insurance Innovations, Inc. ("HII"), Allied National, Inc. ("Allied"), National Brokers of America, Inc. ("NBoA"), and National Congress of Employers, Inc. ("NCE") relating to a health insurance policy Mr. Butler purchased in February 2016. Plaintiffs bring claims on behalf of themselves, as

well as a putative class of all policyholders who had short term medical insurance policies issued by Unified.

Presently before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 98), and Plaintiffs' Second Motion for Partial Summary Judgment (Doc. 125); Defendants Allied and Unified's Motion for Partial Summary Judgment (Doc. 115), and Motion for Summary Judgment (Doc. 128); Defendant HII's Motion for Summary Judgment (Doc. 132); and Defendant NCE's Motion for Summary Judgment (Doc. 137). These motions have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B), and are fully briefed and ripe for the Court's review.

## I.    BACKGROUND[1]

On February 27, 2016, William Corchado of NBoA sold a Unified Life Insurance short term medical health insurance policy (the "Policy") to Mr. Butler over the telephone. NBoA is an insurance brokerage firm. Plaintiffs allege Mr. Corchado was acting as an agent of NBoA and the other named Defendants at the time. The Policy had an effective date of April 1, 2016, and termination date of February 28, 2017.

---

[1] The background facts are taken from the parties' submissions, including the parties' various Statements of Undisputed Facts (Docs. 100, 118, 130, 134, 139, and 151) and Statements of Disputed Facts (Docs. 117, 145, 157, 160, 162, 166, and 171). The facts are undisputed, unless otherwise indicated.

Mr. Corchado represented to Mr. Butler that the policy had a $5,000 deductible, an 80/20 coinsurance agreement, and a $5,000 out-of-pocket maximum.  Mr. Corchado also told Mr. Butler that the Policy came with network access, although he did not discuss balance billing with Mr. Butler.

After purchasing the policy, Mr. Butler received an insurance card in the mail which stated that it was an NCE membership card.  The insurance card also indicated Mr. Butler's coverage provided "network access" through the "MultiPlan Complementary Network."  The parties dispute who was responsible for the content of the card.

Mr. Butler also received an email from HII that contained a link to a portal through which he could review the Policy.  Mr. Butler contends that he never saw the Policy before he purchased it, and that he was never provided with a hard copy of the Policy.  Unified asserts Mr. Butler had an opportunity to read the Policy through the portal, but elected not to do so.

After the sale of the Policy to Mr. Butler, Unified terminated NBoA, including Mr. Corchado, as an agent for Unified, effective March 31, 2016.

In July 2016, Mr. Corchado called Mr. Butler and advised that he was dropping, or no longer representing Unified, and recommended Mr. Butler take out a medical insurance policy with another insurer.  The parties dispute whether this

3

conversation put Mr. Butler on notice that Mr. Corchado was no longer authorized to act as an agent for Unified.

On August 2, 2016, Mr. Butler underwent an ultrasound at the Sidney Health Center, which identified a six-millimeter mass in his left testicle. Following exploratory surgery at CHI St. Alexius in Williston, North Dakota on August 11, 2016, he was diagnosed with testicular cancer. Mr. Butler incurred medical bills in connection with his surgery and related cancer treatment.

Mr. Butler's claims under the Policy were handled by Allied, as a third-party administrator acting on behalf of Unified. Plaintiffs allege that although Mr. Butler's providers submitted medical bills to Allied, none of the bills were paid.

On September 30, 2016 Mrs. Butler called Allied to check on the status of Mr. Butler's claims. Allied's activity log indicated she was told the claims were in line for review and additional time was needed for processing. On October 7, 2016, one of Mr. Butler's providers also contacted Allied, and was told the claims had been received on August 22, 2016 and were in line for processing. The customer service representative estimated normal processing time took approximately 45-60 days. On October 12, 2016, CHI St. Alexius called Allied, and was told the bills were in line for review and it would take 60 days for review.

On October 24, 2016, Allied sent Mr. Butler a letter asking him to provide the names and contact information for all physicians and hospitals where he had

received treatment, or been recommended for treatment, since April 1, 2011.

Plaintiffs completed the form and returned it to Allied on November 8, 2016.  The

letter was sent as part of a "rescission review" process.  A rescission review is

triggered based on diagnostic codes associated with advanced conditions such as

cancer.  Allied's computer system automatically directs the claims handler to begin

the rescission review, and the system automatically pends all of the policyholder's

claims while Allied conducts a 5-year review to see if there is a basis for

rescinding the Policy.  The parties dispute whether the rescission review process is

disclosed in the Policy.

On February 23, 2017, Mr. Corchado left a voicemail on Plaintiffs'

answering machine, stating that Mr. Butler's Policy was set to expire at the end of

the week, and they needed to give him a call back as soon as possible to avoid any

lapse in coverage.  Mrs. Butler returned the call and spoke to Mr. Corchado.  Mr.

Corchado told her that the Policy would be renewed because Mr. Butler was

"grandfathered in."

On February 27, 2017, imaging revealed Mr. Butler's cancer had

metastasized to his lungs, and he was diagnosed with State IV germ-cell tumor,

embryonal cell carcinoma and seminoma.  Mr. Butler was advised he would need

to undergo chemotherapy.  Mr. Butler had planned to go MD Anderson in Texas

for a second opinion.

The Policy with Unified was terminated on February 28, 2017.  Plaintiffs first learned that Mr. Butler was no longer insured by Unified on March 1, 2017, when they were notified by MD Anderson that their insurance had been cancelled.

At that time, Mr. Butler was also covered under an Aflac disability insurance policy.  On February 28, 2017, Mr. Butler's employer filled out an employer statement for Aflac stating Mr. Butler had been off work, with a first date of disability of February 5, 2017.  Two of Mr. Butler's physicians also completed statements for Aflac indicating Mr. Butler was disabled as a result of his cancer and was not released to return to work.

In the meantime, Mr. Butler filed a complaint with the Montana Insurance Department on February 23, 2017, on grounds that there had been no response to any of his claims.  On March 6, 2017, Unified received a letter from the Montana Insurance Department concerning Mr. Butler's complaint.  Plaintiffs state that on March 10, 2017, Plaintiffs' counsel John Morrison also contacted NBoA to inquire why Mr. Butler's claims had not been paid.  Unified disputes whether this communication occurred.

On March 16, 2017, Allied issued several Explanations of Benefits ("EOBs").  This was the first time that Unified paid any portion of Mr. Butler's medical bills.  The EOBs indicated that Allied had discounted the charges from Mr. Butler's providers by approximately 25 to 75 percent.  The discounts shown on

6

the EOBs were calculated using re-pricing software provided by Data iSight.  The

parties dispute whether Data iSight's repricing tool complies with the terms of the

Policy.

Mr. Butler's Policy did not have network access.  As a result, Plaintiffs

assert that Mr. Butler was subject to balance billing for the difference between the

providers' billed amounts and the re-priced amounts determined by Data iSight.

Plaintiffs contend Mr. Butler was promised network access based on the insurance

card and language in the Policy referring to an "In-Network Deductible."  Unified

disputes that network access was promised.  Unified further contends that if

Plaintiffs had exercised their right to appeal after receiving the EOBs, Allied

would have negotiated with Mr. Butler's medical providers, and Mr. Butler's balance

billing amounts likely would have been eliminated.  Plaintiffs assert Mr. Butler

was not informed that an appeal would have resulted in Allied negotiating with his

providers to his benefit.

Allied also denied twelve of Mr. Butler's claims on grounds that they were

incurred after the February 28, 2017 termination date of the Policy.  Plaintiffs

contend Allied failed to determine whether Mr. Butler was eligible for continued

coverage under an Extension of Benefits provision of the Policy.  Plaintiffs assert

Mr. Butler was disabled as a result of his cancer, which triggered the Extension of

Benefits clause in the Policy.  The parties dispute whether Mr. Butler was required

7

to make a claim for the Extension of Benefits.  After this action was initiated, Mr.

Butler provided the Aflac disability reports to Allied in discovery.  Following

receipt of the reports, Allied granted the Extension of Benefits and paid claims for

an extension period of March 2017.  The parties indicate there is some uncertainty

as to whether all outstanding claims have been paid.

Plaintiffs filed this action on April 25, 2017.  (Doc. 1.)  Thereafter, they filed

an Amended Complaint adding class claims.  (Doc. 181.)  Plaintiffs assert all

members of the putative class were sold identical short term medical policies or

policies that were substantially identical in all material respects to Mr. Butler's

policy, and all received an insurance card identical or similar to the card Mr. Butler

received.  Plaintiffs claim Data iSight was applied system-wide such that it reduced

payments for all members of the putative class, and that all members were also

subject to balance billing despite the promise of access to the MultiPlan

Complementary Network.  Unified disputes that payments were reduced system-

wide or that all short term medical policyholders received an insurance card similar

to Mr. Butler's.

## II.   ANALYSIS

### A.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect

the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986).  A dispute as to a material fact is genuine if there is sufficient evidence for

a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.*

The moving party has the initial burden to submit evidence demonstrating the

absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  If the movant meets its initial responsibility, the burden shifts to the

nonmoving party to establish a genuine issue of material fact exists.  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When parties

file cross-motions for summary judgment, the Court reviews each motion on its

own merits.  *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249

F.3d 1132, 1136 (9th Cir. 2001).

     The Court's jurisdiction over this action is based on diversity of citizenship.

Thus, the Court must apply the substantive law of Montana.  *Medical Laboratory*

*Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812

(9th Cir. 2002).  In Montana, the interpretation of an insurance contract is a

question of law.  *Scentry Biologicals, Inc. v. Mid-continent Cas. Co.*, 319 P.3d

1260, 1264 (2014).  A court interpreting an insurance policy is to read the policy as

a whole and, to the extent possible, reconcile the policy's various parts to give each

meaning and effect.  *O'Connell v. Liberty Mut. Fire Ins. Co.*, 43 F.Supp.3d 1093,

1096 (D. Mont. 2014) (*citing Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021 (2008)).  In interpreting insurance contracts, courts also must give terms and words in the contract their usual meaning and construe them using common sense.  *Travelers Cas. & Surety Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 476 (2005); *Monroe v. Cogswell Agency*, 234 P.3d 79, 82 (Mont. 2007) (citing *Stutzman v. Safeco Ins. Co. of America*, 945 P.2d 32 (1997) ("It is well established that in construing and analyzing the terms of an insurance policy we look first to the policy's plain language.  In doing so we apply the 'common sense meaning as viewed from the perspective of a reasonable consumer of insurance products.'").  Any ambiguities in the insurance contract are construed against the insurer and in favor of extending coverage.  *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 929 (2009).

### B.   Plaintiffs' First Motion for Partial Summary Judgment and Unified/Allied's Cross-Motion for Partial Summary Judgment (Breach of Contract Claims) [Docs. 98, 115]

Plaintiffs move for partial summary judgment as to Count I of the Third Amended Complaint as to several breach of contract issues.  Plaintiffs contend Unified breached its contract with Mr. Butler and with members of the putative class in two ways.  First, by discounting medical bills to lower than the "Reasonable and Customary Charge" as defined in the Policy; and second, by not

providing a network as promised, which exposed Mr. Butler and each member of the class to balance billing. Plaintiffs further contend Unified breached its contract with Mr. Butler by terminating coverage on February 28, 2017 without affording him the Extension of Benefits promised in the Policy. Accordingly, Plaintiffs request partial summary judgment in their favor against Unified with respect to these three alleged breaches.

Unified, together will Allied, filed a cross-motion for partial summary judgment on Plaintiffs' breach of contract claims. Unified/Allied argue Plaintiffs' claim that Unified did not pay the "Reasonable and Customary Charge" fails under the plain language of the Policy. Unified/Allied next assert the Policy did not provide for a network, and Unified is not bound by the alleged representations of Mr. Corchado or the insurance card. Unified/Allied further contend that if Mr. Butler had pursued an appeal, he would have been spared balance billing, and states that all balance bills have now been eliminated. Finally, Unified/Allied argue Mr. Butler failed to make a claim for Extension of Benefits or provide notice of disability, and therefore, there was no duty to consider the Extension of Benefits provision. Unified/Allied also point out that benefits under the Extension of Benefits clause have now been granted, and thus, the contract terms have been fully performed.

/ / /

11

**a.**     **Whether Unified Breached its Contract with Mr. Butler by Not Paying the Reasonable and Customary Charge as Defined in the Policy**

The Policy at issue in this case provided the following coverage:

Subject to all provisions of the Policy, if an Insured Person while insured under this Part, incurs Eligible Expenses as a result of a covered Bodily Injury or Sickness, We will pay, upon receipt of proof, the Coinsurance Percentage, specified on the Schedule of Benefits, of the Eligible Expenses which are in excess of any Copayments and Deductibles specified in the Schedule of Benefits, but not exceed the Maximum Benefits specified in the Schedule of Benefits.

(Doc. 181-1 at 17.)

The Policy defined Eligible Expenses as:

those expenses incurred as a result of an Insured Person's Bodily Injury or Sickness which:
a.      are Medically Necessary and which have been recommended and prescribed by a Doctor;
b.      are not in excess of the **Maximum Allowable Charges**, or any Maximum Benefit show [sic] in the Schedule of Benefits, or any charges made in the absence of this insurance;
c.      are not excluded from coverage by this Policy;
d.      do not exceed any amounts payable under this Policy; and
e.      for which the Insured Person is legally liable.

(*Id.* at 5 (emphasis added).)

The Policy, in turn, states:

the Maximum Allowable Charge that will be considered as Eligible Expenses for necessary medical services and supplies generally furnished for cases of comparable severity and nature in the geographical area in which the services or supplies are furnished will be **the lesser of billed charges or the Reasonable and Customary Charge**.

12

(*Id.* at 7 (emphasis added).)

The Policy defined Reasonable and Customary Charge as:

> the **usual charge** made for necessary medical services, drugs, procedures, supplies or treatment generally furnished for cases of comparable severity and nature in the geographical area in which the services, drugs procedures, supplies or treatment are furnished.
>
> "Geographical Area" means:
> a.  the three digit zip code in which the service, treatment, procedure, drugs or supplies are provided; or
> b.  a greater area will be used if necessary to obtain a representative cross-section of charges for a like treatment, service, procedure, device, drug or supply.
>
> In determining whether a charge is reasonable, We may consider such factors as We in the reasonable exercise of Our discretion, determine are appropriate, including but not limited to:
> a.  the complexity of service or supply involved;
> b.  the degree of professional skill, experience and training required for a Doctor to perform the procedure or service;
> c.  the severity or nature of the Bodily Injury or Sickness being treated;
> d.  the provider's adherence or failure to adhere to charge amounts and practices, including but not limited to billing, itemization, coding, bundling (including restriction against unbundling such as may occur in multiple procedures, bilateral procedures or when a Doctor is assisting another Doctor) and documentation practices, generally accepted by an established United States medical society or other pertinent professional organization or governmental agency as determined by Us; or
> d.  the cost to the provider of providing the service or supplied, or performing the procedure.
>
> We subscribe to the standard industry reference sources which collect date [sic] to determine the Reasonable and Customary Charge in a given case.

(*Id.* at 9 (emphasis added).)

Thus, all reimbursement amounts under the Policy hinge on a determination of Reasonable and Customary Charges.

Unified's claims handling agent, Allied, used another party, MultiPlan, to determine Reasonable and Customary Charges. In making this determination, MultiPlan used repricing software called NCN Data iSight ("Data iSight"). Plaintiffs argue this constituted a breach of the Policy, because the Data iSight methodology is not based on what providers usually *charge*, but rather, what they generally agree to *accept*. Thus, Plaintiffs assert Unified/Allied pays less than "the usual charge . . . in the geographical area" in violation of the Policy.

Unified/Allied counter that the Policy permits payment of the *lesser of* either the billed charge, or the Reasonable and Customary Charge. Thus, Unified/Allied contend they were not obligated to pay 100% of the billed charge, but could pay a lesser amount as determined by Data iSight. Unified/Allied point out that the Policy disclosed that a standard industry reference, such as Data iSight, would be used to determine the Reasonable and Customary Charge.

But Unified/Allied misconstrue Plaintiffs' claim. Plaintiffs are not insisting the Policy was breached because Unified/Allied failed to pay 100% of the actual billed charges. Plaintiffs claim the breach occurred because Data iSight's methodology resulted in payments that were less than the Reasonable and Customary Charge, as that term is defined by the Policy. The fact the Policy

14

disclosed that a standard industry reference would be used to determine Reasonable and Customary Charges, does not necessarily mean the re-pricing software comported with the Policy language.  Here, the undisputed evidence shows the repricing determinations made by Data iSight deviated from the clear terms of the Policy.

It is undisputed that Unified/Allied relied on Data iSight to determine Reasonable and Customary Charges.  (Doc. 145 at ¶ 11.)  Unified/Allied's expert witness, Allied claim manager David Scanlan, stated in his expert report that Data iSight's methodology "determines a fair price for professional claims using amounts generally *accepted* by providers as payment in full for services."  (Doc. 101-111 at 4 (emphasis added).)  He further stated that the amounts paid by Allied based on Data iSight are 90% of the amount that "providers typically *accept* as payment for services."  (Doc. 101-11 at 10 (emphasis added).)  In his deposition, Mr. Scanlan also acknowledged that the amount providers typically accept for payment of services is less than what they usually charge for the services.  (Doc. 101-6 at 12.)  He also admitted that the amounts Allied pays based on Data iSight are less than the amounts providers usually bill.  (*Id.*)  Likewise, Robert Jackson of Zelis testified that Zelis' fee schedule is based upon what providers agree to accept as opposed to what providers charge.  (Doc. 146-2 at 3.)  Data iSight uses Zelis' fee schedule as part of its claims analysis.  (Doc. 101-11 at 4-8.)

The plain language of the Policy requires the Reasonable and Customary Charge to be based on the "usual *charge* . . . in the geographic area." (Doc. 181-1 at 9 (emphasis added).) The Policy's use of the term "usual charge" is clear and unambiguous. The Policy could have stated the amount usually accepted; but it did not. "[T]he language of a contract governs its interpretation if the language is clear and unambiguous." *Wicklund v. Sundheim*, 367 P.3d 403, 408 (Mont. 2016).

As such, Unified/Allied's use of Data iSight repricing software that determined Reasonable and Customary Charges based on amounts usually *accepted* as opposed to amounts usually *charged*, did not comport with the plain terms of the Policy. Consequently, Unified/Allied paid claims at a level below that which was promised in the Policy.

Accordingly, the Court recommends summary judgment be granted in favor of Plaintiffs as to Count I of the Third Amended Complaint on the claim that Unified breached its contract with Mr. Butler by not paying "the usual charge . . . in the geographic area" as promised by the Policy. With regard to Plaintiffs' class claims, however, summary judgment should be denied. As discussed in the Court's separate order on Plaintiffs' Motion for Class Certification, the Court has recommended that class certification be denied. As such, Plaintiffs' motion for summary judgment regarding the claims of the putative class members for breach of contract should likewise be denied.

16

### b.   Whether Unified Breached its Contract with Mr. Butler by Exposing Him to Balance Billing Despite Promising Network Access

Plaintiffs argue Mr. Butler was promised network access through: (1) representations of Mr. Corchado; (2) the insurance card; and (3) language in the Policy.  It is undisputed that the Policy did not, in fact, have network access.  As a result, Plaintiffs argue they were subject to balance billing and incurred thousands of dollars in medical debt.  Unified/Allied assert the Policy did not promise a network.  Unified/Allied further argue neither the representations of Mr. Corchado, nor the insurance card can alter the Policy terms.

Although the Policy did not have network access, it did contain one reference to a "Network" in the Schedule of Benefits.  (Doc. 181-1 at 12.) The Policy stated:

Deductible

**In-Network Deductible** per Policy Period per Insured Person………..$5,000
**Out-of-Network Deductible** per Policy Period per Insured Person….$5,000

(Doc. 181-1 at 12 (emphasis added).)

Unified/Allied argue the reference to a "Network" on the Schedule of Benefits that identified a deductible of $5,000 for both "In-Network" and "Out-of-Network" medical services, is merely a "stray, and erroneous" reference. Unified/Allied argue that because the Policy does not refer to a network anywhere else, no network was promised.

The insurer, as the drafter of the Policy, chooses the language contained in the policy, and is thus "responsible for the language which the policy contains." *State Farm Mut. Auto. Ins. Co. v. Queen*, 685 P/2d 935, 937 (Mont. 1984). Nevertheless, the Court does not find the singular reference to a "Network" on the Schedule of Benefits, without any definition of the term network, or any representation or explanation of network coverage, is sufficient to create an implicit promise of network coverage.  Moreover, nothing in the Policy affirmatively states that there was a network.  "Mere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument."  *Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 926 (Mont. 2012).  Accordingly, the Court finds the Policy did not promise network access.

Further, the Court does not find the Schedule of Benefits creates an ambiguity.  A contract provision is ambiguous if it is "reasonably subject to two different interpretations."  *Fisher ex rel. McCartney v. State Farm Mut. Auto. Ins.*, 305 P.3d 861, 865 (Mont. 2013) (citing *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.2d 32 (Mont. 2008)).  "Whether a provision of an insurance contract is 'reasonably susceptible to two different interpretations,' is determined from 'the viewpoint of a consumer with average intelligence, but untrained in the law or the insurance business.'"  *Id.* at 865-66.  Courts must not, however, "create an

18

ambiguity in an insurance policy where none exists." *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021, 1025 (Mont. 2008).

Here, there is nothing on the face of the Policy that would lead a reasonable consumer of insurance products to believe the Policy promised network access. The Court does not believe the sole reference to an "In-Network" deductible on the Schedule of Benefits could reasonably be interpreted to mean a network was promised. Although Plaintiffs also cite to representations made by Mr. Corchado and to the insurance card to support their position, the Policy itself was unambiguous. The Court may not use extrinsic evidence to create an ambiguity or vary the terms of the agreement. *Broadwater Dev. LLC v. Nelson*, 219 P.3d 492, 410-11 (Mont. 2009) (noting that although courts may consider objective evidence of the circumstances under which the agreement was made to determine if a contract contains an ambiguity, courts may not use evidence of surrounding circumstances "to add to, vary, or contradict the terms of the contract" or "to show an intention independent of the instrument."). Thus, for purposes of the breach of contract claim based on network access, the Court finds the Policy is not ambiguous, and therefore, declines to consider the representations made by Mr. Corchado or the insurance card.[2]

---

[2] The Court notes that its ruling with regard to this breach of contract claim does not prejudice Plaintiffs' ability to pursue any of their other claims against Unified/Allied based on the representations about network coverage made by Mr.

Because the Court has determined Plaintiffs' claim for breach of contract based on network access fails as a matter of law, the class claims likewise fail. Accordingly, the Court recommends summary judgment be granted in favor of Unified/Allied on Plaintiffs' breach of contract claim based on network access.

### c. Whether Unified Breached its Contract with Mr. Butler by terminating the Policy Without Affording him the Extension of Benefits Promised in the Policy

Plaintiffs argue Unified/Allied breached the contract by denying claims for expenses incurred after the termination date of the Policy.  Plaintiffs maintain Mr. Butler was disabled at the time, and therefore was entitled to coverage under the Extension of Benefits clause in the Policy.

The face page of the Policy disclosed that it was a "STATED TERM/NON-RENEWABLE" policy.  Specifically, it stated:

> This Policy is issued for a stated term and is not renewable.  Subject to payment of premium when due, this Policy terminates at 12:01 a.m. on the last day of the Policy Term shown in the Policy Schedule.

(Doc. 181-1 at 1.)

Under the section entitled TERMINATION OF INSURANCE, the Policy provided, in part:

---

Corchado or based on the insurance card, which clearly referred to a network.  (*See* Doc. 181-2 at 2 (the insurance card contained a logo for the "MultiPlan Complimentary Network" and immediately below that stated "**Network Access** Multiplan Complementary Network").

The Insurance of an Insured Person shall automatically terminate on the earliest of the following dates:

a. The date the Policy Period expires **subject to any Extension of Benefit rights**.

(*Id.* at 14 (emphasis added).)

The Policy contained the following Extension of Benefits clause:

If a covered Bodily Injury or Sickness commences while the Policy is in force as to the Insured Person, benefits otherwise payable under the Policy for the Bodily Injury or Sickness causing the Total Disability will also be paid for any Eligible Expenses incurred after the termination of insurance for an Insured Person, if from the date of such termination to the date such expenses are incurred, the Insured Person is Totally Disabled by reason of such Bodily Injury or Sickness.

(*Id.* at 25.)

The Policy stated Total Disability means:

an Insured who is prevented by reason of Bodily Injury or Sickness from engaging in and performing any and every duty pertaining to his employment and is not engaged in any occupation for wages or profit[.]

(*Id.*)

The Policy also provided:

NOTICE OF CLAIM

Written notice of claim must be given to us within six (6) months after the occurrence or commencement of any loss covered by the Policy, or as soon thereafter as is reasonably possible.  Notice given by or on behalf of an Insured Person at the address provided, or to any authorized agent of Ours, with information sufficient to identify the Insured Person, shall be deemed notice to Us.

21

PROOFS OF LOSS

Written proof of loss on which a claim may be based must be furnished to Us not later than ninety (90) days after the date of such loss.  Failure to furnish proof within the time required shall not invalidate or nor reduce any claim if it was not reasonably possible to give proof within that time, provided such proof is furnished as soon as reasonably possible, and except in the absence of legal capacity, not later than one year from the time proof is otherwise required.

TIME OF PAYMENT OF CLAIMS

Any benefits provided in the Policy will be paid immediately upon receipt of due written proof.

(*Id.* at 15.)

Unified/Allied argue Mr. Butler did not make any claim for an Extension of Benefits, or provide any proof of disability that would entitle him to the Extension of Benefits, until after this lawsuit was filed.  Unified/Allied argue that once proof of his disability was submitted, it granted the Extension of Benefits and paid the claims.

Plaintiffs contend Mr. Butler was not required to submit a claim to be considered for an Extension of Benefits under the Policy.  Plaintiffs further contend § 33-18-201(4) of the Unfair Claims Settlement Practices Act is incorporated into the Policy, and therefore, Unified/Allied breached the contract by not investigating whether Mr. Butler was disabled as a result of his cancer diagnosis.  Plaintiffs argue Mr. Butler's diagnosis of cancer should have put

Unified/Allied on notice to investigate whether the Extension of Benefits clause was triggered by his illness.

>    1.    *Whether Unified/Allied had a duty to provide benefits under the Extension of Benefits clause when Plaintiff did not submit a claim or proof of loss showing he was disabled*

Unified/Allied would not have been able to determine whether Mr. Butler was Totally Disabled as defined by the Policy unless and until it had information showing that he was "prevented by reason of Bodily Injury or Sickness from engaging in and performing any and every duty pertaining to his employment and is not engaged in any occupation for wages or profit." (Doc. 181-1 at 25.) A cancer diagnosis, alone, would not necessarily show that the insured was Totally Disabled. A cancer diagnosis may prevent some from working and not others. It would depend on the type and stage of cancer, the type, frequency and duration of treatment required, and the unique demands and requirements of each person's occupation.

Further, Mr. Butler had a duty under the Policy to provide a written proof of loss. Here, it is undisputed that Plaintiff did not provide Allied/Unified the reports of his treating physicians and his employer's certification of his disability until after this case was filed. Once the proof of loss was provided, Unified/Allied paid benefits under Extension of Benefits provision. Accordingly, the Court finds

Unified/Allied did not breach the contract by initially denying Mr. Butler's claims for expenses that were incurred after the termination date of the Policy.

> 2.  *Whether Unified/Allied breached the contract by violating § 33-18-201(4) of the UTPA by not investigating whether Mr. Butler was disabled*

Plaintiffs further argue Mont. Code Ann. § 33-18-201(4) should be incorporated and read into the Policy.  Plaintiffs rely on *Sagan v. Prudential Ins. Co.*, 857 P.2d 719, 721 (Mont. 1993) for the proposition that "the provisions of insurance statutes are to be read into an insurance policy as though written therein."  Thus, Plaintiffs contend their breach of contract claim can be based on an allegation that Unified/Allied failed to conduct a reasonable investigation as required by § 33-18-201(4).  Plaintiffs assert that because Unified/Allied knew Mr. Butler was being treated for cancer, they should have investigated whether he was entitled to an Extension of Benefits.

As Unified/Allied correctly point out, however, an alleged violation of the UTPA generally does not give rise to a breach of contract claim.  In *Fossen v. Caring for Montanans, Inc.*, 617 Fed.Appx. 737, 739 (9th Cir. 2015), the Ninth Circuit held that where an insurance policy did not expressly incorporate the UTPA, "the parties did not intend to create contractually a cause of action based on a statutory violation."  *See also State ex rel. Farm Credit Bank of Spokane v. Dist. Court*, 881 P.2d 594, 606 (Mont. 1994) (holding the plaintiffs were permitted to

24

pursue a breach of contract claim based on a statutory violation, but only because the terms of the statute had been expressly incorporated into the contract).

Here, the Policy did not expressly incorporate any provision of the UTPA. Thus, the Court finds that Plaintiffs' breach of contract claim cannot be premised on an alleged violation of the UTPA. Plaintiffs may pursue a direct claim against the insurer under the UTPA for failing to conduct a reasonable investigation. Mont. Code Ann. § 33-18-242(1). But the UTPA claim cannot also serve as a breach of contract claim, because the UTPA was not incorporated into the Policy. *See e.g Williams v. Union Fid. Life Ins. Co.*, 123 P.3d 213, 220 (2005) (permitting insured to purse breach of contract claim against her insurer only because she was not asserting her claim arose due to an alleged UTPA violation).

Accordingly, the Court recommends summary judgment be granted in favor of Unified/Allied on Plaintiffs' breach of contract claim based on the Extension of Benefits provision in the Policy.

### C.    Unified/Allied's Motion for Partial Summary Judgment (Common Law Claims) [Doc. 128]

Plaintiffs assert several common law claims against Unified/Allied and the other Defendants based on statements Mr. Corchado made to Mrs. Butler in February 2017. (Counts IV-VI and VIII-IX.) Unified argues summary judgment on these claims is appropriate because at the time Mr. Corchado made the statements, he was no longer an agent for Unified, and Plaintiffs were aware he no

longer represented Unified.  Allied seeks summary judgment on the common law

claims on the basis that it had no relationship of any kind with Mr. Corchado or his

employer.

Plaintiffs agree that summary judgment is appropriate as to Allied as to

those counts because there is no evidence Allied was involved in the sales process.

But Plaintiffs argue summary judgment should be denied as to Unified.  Plaintiffs

concede that Mr. Corchado did not have actual authority to act on behalf of Unified

in February 2017.  Plaintiffs contend, however, that Mr. Corchado was acting with

ostensible authority, and Unified did not advise Mr. Butler that Mr. Corchado's

agency appointment had been terminated.

 An agent may have either actual or ostensible authority.  *Assoc. Mgmt.*

*Servs., Inc. v. Ruff*, 424 P.3d 571, 587 (Mont. 2018).  "Actual authority is authority

that the principal intentionally confers upon the agent or intentionally or by want of

ordinary care allows the agent to believe that the agent possesses."  Mont. Code

Ann. § 28-10-402.  "Ostensible authority is such as a principal, intentionally or by

want of ordinary care, causes or allows a third person to believe the agent to

possess."  Mont. Code Ann. § 28-10-403.  Ostensible authority does not exist

unless "there is an act of the principal which leads a third party to believe an

agency exists; it must be the principal, not the agent, who intentionally or by want

of ordinary care causes a third person to believe another to be his agent."

26

*Ballanger v. Am. Music Co.*, 104 P.3d 1075, 1079 (Mont. 2004). The belief in ostensible agency must be reasonable. *Larson v. Barry Smith Logging, Inc.*, 884 P.2d 786, 788 (Mont. 1994). "Ostensible authority can be implied from the words and conduct of the parties and the circumstances of the particular case notwithstanding a denial by the alleged principal." *In re Estate of Bodner*, 149 P.3d 913, 2006 WL 3325642, *2 (Mont. Nov. 14, 2006).

Here, factual disputes preclude summary judgment in favor of Unified. It is undisputed that Unified terminated Corchado as an agent effective March 31, 2016. (Doc. 162 at ¶ 5.) But whether Plaintiffs knew Mr. Corchado no longer had authority to act on behalf of Unified is disputed.

Mr. Butler testified that in a July 2016 telephone call, Mr. Corchado told him "they were dropping Unified or Allied or whoever it is, and they recommended we do the same thing. . ." (Doc. 130-2 at 11-12.) Mr. Butler further testified:

> Q. And when he said, "dropping Unified Life," did you understand that to mean that he and his company no longer represented Unified Life?
>
> A. That was pretty much my understanding. They weren't going to do business with them anymore.

(*Id.* at 13.)

Unified asserts this exchange shows unequivocally that Mr. Butler knew Mr. Corchado no longer had authority to represent Unified.

27

Plaintiffs counters that Mr. Butler's testimony shows only that Mr. Corchado was choosing not to sell Unified products as of July 2016. It does not establish, however, that Mr. Corchado did not have authority to provide services for Unified policies he had previously sold. Plaintiffs further point out it is undisputed that Unified never notified Mr. Butler that Mr. Corchado's authority as an agent had been terminated. Plaintiffs point to the following deposition testimony of Unified's President Kevin Dill:

> Q.     And Unified never contacted Charlie Butler to tell Charlie Butler that NBOA was no longer authorized to speak for Unified, did they?
>
> A. No.
> . . .
>
> Q. …Are you aware of any reason why Charlie Butler would know that NBOA had been terminated by Unified Life?
>
> A. Excuse me.  No.

(Doc. 163-2 at 3.)

Both parties' interpretations of Mr. Corchado's statements find support in the record, and a reasonable fact-finder could find for the Plaintiffs on this issue. Therefore, whether Mr. Corchado was acting with ostensible authority in February 2017 is a question of fact for the jury. *See Am. Cas. Co. v. Krieger*, 181 F.3d 1113, 1121 (9th Cir. 1999) (noting that generally the question of ostensible authority is for a trier of fact to resolve, and should not be decided on summary judgment).

28

Accordingly, summary judgment on the common law counts (Counts IV, V, VI, VIII, and IX) should be denied as to Unified, and granted as to Allied.

### D. Plaintiffs' Second Motion for Partial Summary Judgment [Doc. 125] and HII's Cross-Motion for Summary Judgment [Doc. 132]

Plaintiffs' second motion for partial summary judgment seeks summary judgment on two grounds.  First, Plaintiffs seek summary judgment against Unified/Allied on their breach of contract claim based on Unified/Allied's automatic rescission review program.  Second, Plaintiffs seek a ruling that HII was legally responsible for the conduct of NBoA in the sale of the Policy to Mr. Butler. HII has filed a separate cross-motion for summary judgment arguing it is not legally responsible for NBoA's conduct, and therefore, all claims against it fail as a matter of law.

### a. Unified/Allied's Automatic Rescission Review Program

Plaintiffs contend Unified/Allied automatically instituted a rescission review based on the diagnostic codes associated with Mr. Butler's medical bills.  As a result, Plaintiffs assert Mr. Butler's claims were held, or "pended," and not paid while the review took place.  Plaintiffs argue Unified/Allied's automatic rescission program violated Mont. Code Ann. §§ 33-18-232 and 33-18-201, and constituted a breach of contract.

/ / /

/ / /

29

Section 33-18-232 provides:

(1) An insurer shall pay or deny a claim within 30 days after receipt of a proof of loss unless the insurer makes a reasonable request for additional information or documents in order to evaluate the claim.  If an insurer makes a reasonable request for additional information or documents, the insurer shall pay or deny the claim within 60 days of receiving the proof of loss unless the insurer has notified the insured . . . of the reasons for failure to pay the claim in full or unless the insurer has a reasonable belief that insurance fraud has been committed and the insurer has reported the possible insurance fraud to the commissioner.  This section does not eliminate an insurer's right to conduct a thorough investigation of all the facts necessary to determine payment of a claim.
. . .

(3) A private cause of action under 33-18-201 or 33-18-242 may not be based on the compliance or noncompliance with the requirements of this section and evidence of compliance or noncompliance with this section is not admissible in any private action based on 33-18-201 or 33-18-242.

Mont. Code Ann. § 33-18-232.

Section 33-18-201 provides in relevant part that an insurer may not:

(5) fail to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.
. . .
(13) fail to promptly settle claims, if liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage[.]

Mont. Code Ann. § 33-18-201.

Plaintiffs' breach of contract claim based on the rescission review appears to be two-fold.  First, Plaintiffs argue §§ 33-18-232 and 33-18-201 should be incorporated into the Policy as though they were written therein, and thus contend a breach of contract claim can be premised on a violation of these statutes. Plaintiffs state it is undisputed that Unified/Allied did not pay or deny Mr. Butler's claims within the time frames set forth in § 33-18-232, and therefore, the Policy was breached.  Second, Plaintiff's contend that Unified/Allied breached the plain language of the Policy, which promised to pay Mr. Butler's medical expenses, by stalling the processing of Mr. Butler's claims in order to conduct the rescission review.  Additionally, Plaintiffs allege a direct claim under the UTPA.  In addition to its breach of contract claims, Plaintiffs argue Unified/Allied's rescission review was a *per se* violation of §33-18-201(5), (6) and (13).

Unified/Allied counter that §33-18-232 expressly bars private claims based on alleged noncompliance with the statute.  They also argue that merely conducting a rescission review does not equate to a breach of the Policy. Unified/Allied further argue factual issues preclude summary judgment on Plaintiffs' UTPA claims under § 33-18-201(5), (6) and (13).

First, to the extent Plaintiffs' breach of contract claim and/or their UTPA claim is based on a violation of § 33-18-232, their claims are barred.  Section 33-18-232(3) expressly provides that a private right of action may not be based on

31

noncompliance with the statute, and that evidence of noncompliance is not admissible in any private action that is permitted under the UTPA.  Mont. Code Ann. § 33-18-232(3.)  Accordingly, Plaintiffs are not entitled to summary judgment based on the alleged violation of § 33-18-232.

Second, to the extent Plaintiff's breach of contract claim is premised on § 33-18-201(5), (6) and (13) of the UTPA, the alleged violations do not give rise to a claim sounding in contract.  *See Fossen*, 617 Fed.Appx. at 739 (rejecting argument that UTPA claims sound in contract).  As discussed above, the Policy did not expressly incorporate the UTPA.  Thus, the UTPA cannot serve as the basis for a breach of contract claim.  Therefore, Plaintiffs are not entitled to summary judgment on that basis.

Next, Plaintiffs have not shown a breach of contract based on a breach of the Policy language itself.  The Policy provides that the insurer had the right to terminate the Policy based on "material misrepresentation, fraud, or material omission of information on any application form, or in requesting the receipt of benefits under the Policy."  (Doc. 181-1 at 14.)  Unified/Allied assert they had a reasonable basis to initiate the rescission review because Mr. Butler was treated for cancer not long after answering "no" to a question on the insurance application about whether he had previously been treated, tested for, or diagnosed with cancer.

Unified/Allied's argument finds some support in the record, and a reasonable fact-finder could agree with its position.  Therefore, whether Unified/Allied's decision to conduct a rescission review in these circumstances violated the Policy is a question of fact for the jury.  As such, summary judgment is not appropriate.

Finally, with regard to Plaintiffs' direct UTPA claims under §33-18-201(5), (6), and (13), summary judgment is not appropriate because there are factual issues regarding the reasonableness of Unified/Allied's decision to conduct the rescission review.  Section 33-18-242(5) provides that an insurer "may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue."  Mont. Code Ann. § 33-18-242(5).  Generally, reasonableness is a question of fact for the jury, particularly with regard to determining whether an insurer had a "reasonable basis" in fact for contesting a claim.  *Redies v. Attorneys Liability Protection Soc.*, 150 P.3d 930, 937-38 (Mont. 2007).  Both Plaintiffs and Unified/Allied have submitted expert opinions concerning the appropriateness of the rescission review process.  *See* Doc. 166-4 at 6-7 (Unified/Allied's expert opined that the rescission review was consistent with the Policy and industry standards); Doc. 175-2 at 3-5 (Plaintiffs' expert opined that the rescission review was unreasonable).  Therefore, there are disputed issues of material fact for a jury to resolve.

33

Accordingly, Plaintiffs' Second Motion for Partial Summary Judgment against Unified/Allied based on the rescission review should be denied.

### b.   HII's Liability for the Conduct of NBoA

Both Plaintiffs and HII move for summary judgment on the issue of whether HII is responsible for the conduct of NBoA.  Plaintiffs seek a ruling that HII had a contractually assumed, nondelegable duty to solicit sales of Unified policies, and is therefore legally responsible for the conduct of its managing general agent, NBoA in the sale of the Policy to Mr. Butler.  Whereas, HII seeks a ruling that it is not liable for the actions of NBoA, and all of Plaintiffs' claims against it fail as a matter of law.

Plaintiffs assert the following claims against HII:  unfair claims settlement practices (Count II); fraudulent inducement (Count III); deceit (Count IV); constructive fraud (Count V); negligent misrepresentation (Count VI); breach of insurance agent absolute duty (Count VII); promissory estoppel (Count VIII); equitable estoppel (Count IX); common law bad faith – alternative claim handling count (Count X); negligence – alternative claim handling count (Count XI); negligence *per se* – alternative claim handling count (Count XII); breach of fiduciary duty – alternative claim handling count (Count XIII); and malice (Count

XIV).[3]  Counts III, IV, V, VI, VII, IX, and XIV all relate to the sale of the Policy

to Mr. Butler.  Counts II, and X – XIII pertain to the claims handling process.

HII asserts summary judgment is appropriate in its favor because (1) it is not

responsible for claims or claims handling since it is not an insurer or claims

handler; (2) it is not vicariously liable for NBoA's conduct under agency

principles; (3) it is not vicariously liable for any misrepresentation contained in the

Policy or insurance card; and (4) there was no direct duty flowing from HII to

Plaintiffs in this case.

HII describes itself as a company that simply owns an internet technology

platform upon which insurance business is conducted.  HII contends its role in this

case was limited to hosting the online platform, performing some billing and

customer service functions, and providing insurer-approved training material to the

independent agency that sold the Policy to Mr. Butler.

Plaintiffs argue HII's role in this case was not as limited as HII suggests.

Plaintiffs assert summary judgment in their favor is appropriate because HII and

NBoA had a contractual relationship that specified NBoA was HII's managing

general agent for the very purposes at issue in this case.  Plaintiffs assert HII

contractually agreed to be Unified's agent with respect to the sale and solicitation

---

[3] HII argues it is also entitled to summary judgment on Plaintiffs' breach of
contract claim in Count I.  Count I, however, was not alleged against HII.  (*See*
Doc. 181 at ¶¶ 29-35.)

of Unified's insurance products, and also assumed various other duties.  Plaintiffs

argue HII fulfilled its sales and solicitation responsibilities to Unified through its

managing general agent contract with NBoA.  As a result, Plaintiffs argue HII is

liable as a principal for Mr. Corchado's misrepresentations in the sale of the

Policy.  In addition, Plaintiffs argue HII exercised actual control over NBoA's

sales practices and participated in delaying the termination of NBoA's agency.

Finally, Plaintiffs contend NBoA had apparent authority to act for HII even after

HII terminated its managing general agreement with NBoA.

   1. *Additional Facts Relating to HII*

  In March of 2013, HII entered into a written Managing General Agent

Agreement ("MGAA") with NBoA.  The MGAA stated that HII is "a marketing

and administrative company that provides medical care solutions to individuals and

families," and that NBoA is "a licensed insurance agent."  (Doc. 134-1 at 3.)

Under the agreement, HII retained NBoA "to represent it as MANAGING

GENERAL AGENT for purposes of soliciting and retaining licensed insurance

agents to promote and effect sales of products available through HII."  (*Id.*)

  On April 14, 2015, HII entered into a Program Manager Agreement

("PMA") with NCE and Xchange Benefits, LLC ("Xchange").  Xchange was the

Managing General Underwriter for Unified.  Under the PMA, HII agreed to

"accept appointment as Unified Life's agent with respect to the sale of Products in

the Service Area." (Doc. 134-2 at 2.) HII was also appointed "to perform certain

other services with respect to the Products." (*Id.*) The PMA further provided:

> Xchange, as authorized agent of Unified Life, hereby appoints [HII]
> during the term of this Agreement and [HII] hereby accepts such
> appointment as Unified Life's agent with respect to the Products in
> the Service Area. Xchange, for itself and as authorized agent of
> Unified Life, and NCE hereby appoint and authorize [HII] to perform
> the services set forth in <u>Exhibit C</u> ("<u>Services</u>") with respect to the
> Products in the Service Area.

(*Id.*)

Exhibit C to the MPA required HII to do the following with regard to the

sale and solicitation of Unified products:

> 1.    Solicit individuals to purchase Products on behalf of Unified
>       Life in accordance with the written underwriting guidelines of
>       Unified Life provided to [HII] by Unified Life or Xchange
>       Benefits, as the authorized agent of Unified Life, from time to
>       time ("<u>Underwriting Guidelines</u>").
>
> 2.    Verify the eligibility of each individual proposed to be insured
>       by Unified Life in accordance with the Underwriting
>       Guidelines.

(*Id.* at 16.)

In addition, HII agreed to bill insureds and collect premium payments,

assemble and transmit policies and other written communications and notices to

insureds, and provide "general nonclaims assistance to insureds," including

responding "to inquiries by actual or potential insureds with respect to the scope

and amounts of coverage provided by the Products." (*Id.*)

Plaintiffs maintain that HII fulfilled it solicitation responsibilities to Unified under the PMA through its MGAA with NBoA.  On January 13, 2016, however, Unified's compliance manager, Sandy Price, emailed representatives from NCE and Xchange notifying them that "Unified would like to terminate all agent appointments associated with the National Brokers of America agency and discontinue using this agency to sell Unified products. . . . NCE and Xchange can discuss and determine next steps with regards to the contracts with the agents/agencies."  (Doc. 134-6 at 2.)

On January 21, 2016, Ms. Price sent a follow-up email to NCE, Exchange, and Dan Garavuso of HII stating:

> I asked our Administration team for confirmation today that the appointments had been terminated, but I found out they had not been terminated. . . .
>
> Dan – As HII has the sales link with the agency and these agents, please confirm the date the agents/agency no longer had the ability to sell on behalf of Unified.  Further, in order for Unified to confirm that National Brokers of America is not appointed with Unified, we need a license number and/or Tax ID in order to complete the process.  We only have Alan Redmond's individual agent information.  Please notify us if any other agents were working in this
>
> This [is] an urgent matter that needs to be resolved today, if possible."

(Doc. 134-6 at 4.)

Ned Browne from Xchange responded on the same date, copying NCE, HII and others, saying:

> [W]e are in the midst of retrieving all of the necessary information on
> which to base a collaborative decision with regard to the agents in
> question.  Although we are inclined to term them based on what we
> have heard, we do not have all of the facts to make an informed
> decision.
>
> I have asked HII to gather all the facts available to me and ultimately
> Unified to make a proper determination based on all of the
> information available to all parties.  Dan and Bryan have assured me
> that I will have it today.

(*Id.*)

Ms. Price responded the same day, stating: "I understand and appreciate your wanting to gather more information.  Please know that we have made our determination and have terminated the appointments for the agents/agency."  (*Id.* at 3.)  She indicated she was also still waiting on the information she had requested from HII regarding the agent licensing information.  (*Id.*)

After this e-mail exchange, Mr. Corchado of NBoA sold the Policy at issue in this case to Mr. Butler on February 27, 2016.  HII's platform was used during the sales call to process Mr. Butler's application.  After the sale was complete, the HII platform sent an email to Mr. Butler, which provided a link he could use to view the Policy.  HII also provided notice to a third-party vendor to print and mail a welcome letter and insurance card to Mr. Butler.  HII asserts it did not draft the language placed on the insurance card.  Plaintiffs dispute this contention.

Four days later, on March 1, 2016, Ms. Price emailed HII, coping NCE and Xchange, stating: "Please help me understand why these agents are continuing to

sell for Unified after we requested the termination in January." (Doc. 134-6 at 9.) Ms. Price noted that nine agents from NBoA were still selling Unified products, including Mr. Corchado. (*Id.*)

Mr. Garavuso of HII responded, copying NCE and Xchange, explaining: "I checked my notes on the matter and, after your initial email describing the action taken against NBoA by Unified, further discussions were held with Xchange, NCE, HII, and Unified's Kevin Dill where the scope of the termination was discussed and limited to Allan Redmond & Brad Butler, who were responsible for the bulk of the sales & complaints. . . . We fully understand where you're coming from with your concerns but . . . we're making our best effort to mitigate risk by proactively shoring up NBoA's sales operations by lending our expertise and maintaining oversight on the agency." (*Id.*)

Nevertheless, NBoA was ultimately terminated as a Unified agent on March 31, 2016. Then, on June 1, 2016, HII notified NBoA that it was terminating the MGAA effective July 1, 2016.

On or about July 19, 2016, Mr. Corchado called Mr. Butler. Mr. Corchado told Mr. Butler "they were dropping Unified or Allied or whoever it is, and they recommended we do the same thing. . .", and encouraged Mr. Butler to purchase a different policy. (Doc. 130-2 at 11-12.) HII contends Mr. Corchado also stated he

and NBoA would no longer be working with HII.  Plaintiffs dispute this latter

contention.

On or about February 23, 2017, Mr. Corchado spoke with Mrs. Butler and

indicated the Policy would be renewed because Mr. Butler was "grandfathered in."

The parties dispute whether Mr. Corchado had apparent authority to act for HII at

that point in time.

After Plaintiffs learned the Policy had been terminated on March 1, 2017,

Mrs. Butler called HII, and states she was told that Mr. Corchado did not have

authority to renew the Policy.

### 2.   *HII's Liability for NBoA's Conduct*

The Court finds there are numerous questions of fact that preclude summary

judgment with regard to the claims against HII in Counts III-IX, and XIV, relating

to the sale of the Policy.

### i.   Actual Agency Between HII and NBoA for the Sale of the Policy

First, there are disputed issues of fact concerning whether NBoA was an

actual agent of HII based on the MGAA and PMA.

"An agency is either actual or ostensible. An agency is actual when the agent

is really employed by the principal. An agency is ostensible when the principal

intentionally or by want of ordinary care causes a third person to believe another to

be the principal's agent when that person is not really employed by the principal."

Mont. Code Ann. § 28-10-103.  Under Montana law, a principal is liable for the

negligence and wrongful acts of the agent that are committed within the scope of

either actual or ostensible agency.  Specifically, Montana law provides:

> An agent represents the agent's principal for all purposes within the
> scope of the agent's actual or ostensible authority, and all the rights
> and liabilities that would accrue to the agent from transactions within
> that limit, if the transactions had been entered into on the agent's own
> account, accrue to the principal.

> Mont. Code Ann. § 28-10-601.

> 1) Unless required by or under the authority of law to employ that
> particular agent, a principal is responsible to third persons for the
> negligence of the principal's agent in the transaction of the business of
> the agency, including wrongful acts committed by the agent in and as
> a part of the transaction of business, and for the agent's willful
> omission to fulfill the obligations of the principal.

> (2) A principal is not responsible for other wrongs committed by the
> principal's agent except those mentioned in subsection (1) unless the
> principal has authorized or ratified the acts, even though they are
> committed while the agent is engaged in the principal's service.

> Mont. Code Ann. § 28-10-602.

The Montana Supreme Court has recognized that allegations of agency

generally "involve questions of fact which preclude resolution by summary

judgment," unless "undisputed evidence concerning the status of the parties

defendant to each other is reasonably susceptible of but a single inference."

*Semenza v. Kniss*, 189 P.3d 1188, 1191 (Mont. 2008).

Here, both parties submit different explanations of the relationship between

42

NBoA, HII and Unified, and present different interpretations of the

interrelationship of the PMA and MGAA.

Plaintiffs point to evidence that NBoA contracted with HII under the MGAA

to represent HII as its managing general agent to solicit and retain insurance agents

to "promote and effect sales of products available through HII."  (Doc. 134-1 at 3.)

Plaintiffs state HII later agreed to perform sales, marketing and customer service

duties for Unified under the PMA, including solicitation of individuals to purchase

Unified health insurance policies.  Plaintiffs assert HII fulfilled its solicitation

obligations to Unified through the agreement it had with NBoA.  Thus, Plaintiffs

conclude the agreements, read together, establish that NBoA was acting as the

agent of HII under the MGAA in the solicitation and sale of Unified's insurance

products, and HII is legally responsible for the conduct of NBoA.  Specifically,

with regard to this case, Plaintiffs state it is undisputed the Policy Mr. Butler

purchased was a product available through HII's platform at the time NBoA and

Mr. Corchado sold it to him, and that the HII platform was used to effectuate the

sales transaction.

HII, on the other hand, asserts there was no actual agency between it and

NBoA in this particular case.  HII states it had a preexisting relationship with

NBoA under the MGAA, but that the MGAA was separate from, and not

incorporated in any way into the PMA.  Although HII acknowledges it agreed in

43

the PMA to have Unified policies sold on its platform, HII argues it did not agree to be Unified's exclusive agent.  Rather, HII argues Xchange retained the right to independently appoint any agent for Unified.  In support, HII points to language in the PMA which provided that Xchange retained responsibility for "collecting all required information for producer and sub-producer appointment with respect to the Products, including with respect to [HII] and any producers or sub-producers recommended by [HII] to Xchange."  (Doc. 134-2 at 3.)  With regard to selling agents, the PMA also stated:

> Xchange shall, as the duly authorized agent of Unified Life: (a) with respect to [HII], upon receipt by Xchange of licensing, appointing or contracting materials required by Xchange, promptly review such materials, (b) with respect to producers and sub-producers recommended by [HII] to Xchange, upon receipt by Xchange of licensing, appointing or contracting materials required by Xchange, promptly review such materials and render an appointment decision in writing to [HII], (c) ensure that appointments are promptly effected in accordance with applicable laws, and promptly notify [HII] and, if applicable, the applicable producer or sub-producer in writing when such appointment is effective, and (d) promptly notify [HII] and, if applicable, the applicable producer or sub-producer, if Xchange decides (or is directed by Unified Life) to terminate such appointment, including the effective date of such termination.

(*Id.*)

HII further asserts that Xchange used its authority under the PMA to independently appoint the NBoA agents, including Mr. Corchado, to sell Unified policies.  HII states this was an independent appointment agreement that did not flow through or involve HII.  Thus, HII concludes the fact Mr. Corchado and

44

NBoA sold a Unified Policy to Mr. Butler does not necessarily mean it is liable for NBoA's conduct.

Based on the evidence presented, the Court cannot find the relationship between NBoA, HII and Unified, or the interrelationship between the PMA and MGAA, "is reasonably susceptible of but a single inference." *Semenza*, 189 P.3d 1188 at 1191. Rather, both parties' positions on their relationship, and their interpretations of the PMA and MGAA, find some support in the record. A reasonable jury could return a verdict in favor of either party on this issue. Accordingly, the Court cannot say as a matter of law whether NBoA was HII's agent in connection with the sale of the Policy to Mr. Butler.[4]

### ii.   Whether NBoA was an Independent Contractor

HII further asserts, however, that even if the MGAA applied to the sale of the policy to Mr. Butler, NBoA and Mr. Corchado were acting as an independent contractor, and HII is not vicariously liable for their actions. But the Court finds there are also many disputed issues of fact regarding whether NBoA acted as an independent contractor under the agreement.

---

[4] Even if the Court were to find that HII accepted an exclusive appointment to sell Unified policies under the PMA, the Court does not agree with Plaintiffs that this necessarily created a non-delegable duty. While Montana has applied the non-delegable duty exception to the respondeat superior doctrine in limited circumstances – such as "instances of safety where the subject matter is inherently dangerous" – it has not done so in any analogous case. *See, e.g. Maguire v. State*, 835 P.2d 755, 759 (Mont. 1992).

"The general common law rule, which Montana follows, is that an employer is not liable for the negligence or wrongdoing of an independent contractor." *Dvorak v. Matador Serv., Inc.*, 727 P.2d 1306, 1308 (Mont. 1986). "An individual is an employee of another when that other has the right to control the details, methods, or means of accomplishing the individual's work." *Butler v. Domin*, 15 P.3d 1189, 1194 (Mont. 2000). Montana courts typically look to the following factors to determine whether a company has right of control over a contractor: (1) direct evidence of right or exercise of control, (2) method of payment, (3) furnishing of equipment, and (4) right to fire. *Brookins v. Mote*, 292 P.3d 347, 355 (Mont. 2012).

HII asserts there is no agency relationship between it and NBoA because NBoA was a "true independent contractor." Thus, HII argues it is not liable for NBoA's conduct. In support, HII cites to language in the MGAA that suggests NBoA was an independent contractor. For example, the MGAA provided that NBoA "is an independent contractor," and "will be controlling the means, details, and amount of time by which [NBoA] performs its services under this Agreement." (Doc. 134-1 at 3.) Under the MGAA, NBoA was also "free to engage in any business activities of its choosing" during the term of the Agreement. Further, the agreement stated "[i]n performance of any and all of the obligations hereunder,

[NBoA] shall be acting on its own behalf and not as an employee, partner or associate of HII[.]"  (*Id.*)

Plaintiffs counter that despite the fact the MGAA referred to NBoA as an "independent contractor," the agreement nevertheless permitted HII to retain substantial control over NBoA.  For example, the MGAA provided that NBoA agreed to "recruit, train and supervise agents, subject to approval by HII, to promote and effect sales of products available through HII."  (Doc. 134-1 at 4.) HII reserved the right "to refuse to accept any proposed agent, at HII's sole discretion."  (*Id.*)  NBoA was also obligated to "comply with all HII's rules and regulations and with all laws and regulations of the state" and "timely and adequately train all agents."  (*Id.*)  The MGAA also stated NBoA did not have the authority "to make, alter or waive any procedural rule or regulation of HII," "issue or circulate advertisements or literature unless first approved in writing by HII," "to alter any forms provided by HII," or "to substitute forms in place of those provided by HII."  (*Id.* at 4-5.)

Plaintiffs also argue HII actually exerted extensive control over NBOA. Plaintiffs point to evidence showing HII oversaw compliance, was  involved in audits, and was responsible for providing training to NBoA.[5]  For example,

---

[5] Plaintiffs filed a Notice of Supplemental Authority after the briefing was complete on HII's Motion for Summary Judgment, and attached a form 8-K filed by HII before the United States Securities and Exchange Commission and a

Plaintiffs cite the following deposition testimony of Dan Garavuso, Vice President

of compliance for HII:

> Q. Do your responsibilities as the vice president of compliance
> include making sure that HII carries out its responsibilities honestly
> and fairly and in compliance with the law?
>
> A. To best of my understanding, yes.
>
> Q. Do you take steps to ensure that producers who you work with in
> the sale of policies are in compliance with the law?
>
> A. Yes.
>
> Q. In fact, you said that one of your specific areas is call center
> quality; is that right?
>
> A. That's correct.
>
> (Doc. 163-3 at 13.)

In response to a question about what steps HII took to ensure NBoA carried

out its work in a fair and honest manner and in compliance with the law, Mr.

Garavuso answered:

---

regulatory settlement agreement.  (*See* Doc. 203.)  HII filed a Motion to Strike the
supplemental filing, arguing it is not relevant, and that Plaintiffs are improperly
attempting to introduce a new point of fact.  Local Rule 7.4 permits parties to
advise the Court when "pertinent and significant authority" has come to a party's
notice after the briefs were filed.  Courts in this district typically only permit new
legal authority to be provided under this rule, not additional factual information.
*See e.g. Rock Creek Alliance v. U.S. Forest Serv.*, 2009 WL 10677861, *1 (D.
Mont. Nov. 24, 2009).  The Court finds the information supplied by Plaintiffs is
factual in nature.  Further, the Court finds it is not necessary to its determination of
HII's Motion for Summary Judgment.  Accordingly, HII's Motion to Strike
Plaintiffs' Notice of Supplemental Authority (Doc. 209) should be **GRANTED**.

A. We would ensure that the agency was given all of the product information supplied by the carriers.  We would hold trainings on that product information.  We would do an on-site visit once per year as part of agency oversight.

(*Id.* at 3.)

The evidence presented by Plaintiffs create genuine issues of material fact regarding HII's right to control NBoA, and whether NBoa was acting as an independent contractor under the agreement.  A reasonable jury could find in favor of Plaintiffs on the independent contractor issue.

iii.     Ostensible Agency after NBoA was terminated from MGAA

Third, there are disputed issues of fact regarding whether HII is liable for Mr. Corchado's February 2017 misrepresentations under a theory of ostensible agency.  HII asserts it is undisputed that its relationship with NBoA under the MGAA had been terminated by the time Mr. Corchado told Mrs. Butler the Policy would be renewed.  But as discussed above with regard to Unified's ostensible agency argument, there are disputed issues of fact relating to the Butlers' understanding of Mr. Corchado's continued authority to sell and/or service Unified products.

iv.     Liability for Misrepresentation based on the Insurance Card

Fourth, there are disputed issues regarding HII's liability for the alleged misrepresentations on the insurance card issued to Mr. Butler.  HII asserts it was

49

not responsible for the content of the card.  HII states it did not draft the language

on the card, but rather, it was required by Allied and approved by Unified.  HII

cites the following deposition testimony of Kevin Dill of Unified:

> Q. Have you seen those cards?
> A. Yep.
> Q. Did you approve those cards?
> A. Our compliance department would have approved those cards, yes.
>
> . . .
>
> Q. Do you know why, with this short-term medical product, this
> insurance card was sent to Charlie Butler telling him he was part of
> the Multiplan Complementary Network?
>
> A. The - - my under – my understanding is that that's part of the
> Multiplan contract that Allied has with Multiplan, is that the logo has
> to be on the card.  It was approved by Allied.
>
> (Doc. 134-5 at 3-4.)

Plaintiffs counter that although Unified and Allied approved the card as

presented to them, HII was responsible for telling the printer what information to

put on the insurance card.  Plaintiffs cite to the following deposition testimony of

Mr. Garavuso of HII:

> Q. That is the front and back of an insurance card for Charlie Butler
> and the policy that's at issue in this case, would you agree?
> A. That's what it shows.
> Q. Who creates this card?  Does HII create this card?
> A. HII assembles the various elements.
> Q. Who actually prints the card?
> A. It's called Fine Line.  It's a third-party vendor out in Indiana, I
> believe.
> Q. Is that vendor a printer?

A. Yes.

Q. And does HII tell Fine Line what to put on the card?

A. Yes. We send them the information.

(Doc. 139-3 at 3.)

> v.   Liability for Participation in Delayed Termination of NBoA

Finally, there are disputed issues of fact regarding whether HII is liable for

NBoA's conduct because it was aware of complaints about NBoA, but participated

in delaying the termination of NBoA.  Plaintiffs contend the delayed termination

resulted in NBoA selling the Policy to Mr. Butler.

Under Montana law, a person is subject to liability for the harm to a third

person from the tortious conduct of another if: (1) the other's conduct is a breach

of duty; (2) he knows that the other's conduct is a breach of duty; and (3) he

provides substantial assistance or encouragement to the other for such conduct.

*Newman v. Lichfield*, 272 P.3d 625, 634 (Mont. 2012).

There are disputed issues of fact concerning whether HII was aware of

complaints of misconduct by NBoA, and whether HII substantially assisted or

encouraged its conduct by participating in delaying NBoA's termination and

allowing it to continue to conduct business on HII's platform.

Plaintiffs assert HII's knowledge can be gleaned from a 2015 audit report

and the early 2016 email exchanges.  For example, the 2015 audit report indicated

one of HII's objectives in conducting the audit of NBoA was to "address a trend in

51

agent complaints." (Doc. 171-1 at 1.) The audit report indicated NBoA had 93 non-regulatory complaints from January 1, 2015 through October 15, 2015. (*Id.*) The audit further indicated there were concerns with sales floor managers, and noted two managers had been terminated for "bad sales practices." (*Id.* at 7.) In addition, the audit stated that NBoA admitted agents had not been trained properly and it was in the process of retraining all agents. (*Id.*)

With regard to the delay in termination, HII argues the request from Unified to unappoint NBoA was not directed to HII, but rather only to NCE and Xchange. (Doc. 134-6 at 2.) HII further argues that it did not have the power or authority to unappoint agents on behalf of Unified. HII therefore asserts that any delay in the unappointment process was attributable to Unified and Xchange.

In response, Plaintiffs cite to the email exchanges between Ms. Price and HII, NCE and Xchange in January and March of 2016 to show that HII was involved in delaying the termination of NBoA. The emails show HII was aware Unified wanted to terminate NBoA, and that Ms. Price's January 21, 2016 email directly addressed Mr. Garavuso from HII. (Doc. 134-6 at 4 ("Dan – As HII has the sales link with the agency and these agents, please confirm the date the agents/agency no longer had the ability to sell on behalf of Unified."). The emails also support Plaintiffs' contention that HII contributed to the delay in NBoA's termination. For example, Ms. Price indicated she was "still in need of

52

information that I requested below from Dan [HII] regarding the dates and IDs."
(*Id.* at 3.)  Ned Browne from Xchange also indicated he was waiting on
information from HII in order to "base a collaborative decision with regard to the
agents in question."  (*Id.* t 4.)  Finally, Mr. Garavuso himself admitted that after
Ms. Price's "initial email describing the action taken against NBoA by Unified,
further discussions were held with Xchange, NCE, HII, and Unified's Kevin Dill
where the scope of the termination was discussed and limited to Allan Redmond &
Brad Butler, who were responsible for the bulk of the sales & complaints."  (*Id.* at
9.)  He indicated that rather than immediately terminate NBoA, HII was "making
our best effort to mitigate risk by proactively shoring up NBoA's sales operations
by lending our expertise and maintaining oversight on the agency."  (*Id.*)

Therefore, viewing the evidence in a light most favorable to the Plaintiffs,
there is sufficient evidence in the record to create an issue of fact concerning HII's
knowledge of NBoA's misconduct, and whether HII provided encouragement and
assistance to NBoA by permitting NBoA to continue to sell Unified Products on its
platform, and by delaying NBoA's termination.

In sum, because of the numerous disputed issues relating to the relationships
and agreements between the Defendants, summary judgment is not appropriate as
to HII on Counts III-IX, and XIV, relating to the sale of the Policy.

/ / /

3.    *HII's Liability for Claim-Handling Counts*

With regard to Plaintiffs' claims against HII in Counts II and X-XIII,

relating to claims handling, the Court finds summary judgment in HII's favor is

appropriate.  First, Plaintiffs have not presented any evidence that HII is an insurer

within the meaning of the UTPA.  Further, Plaintiffs have not shown HII was

responsible for adjusting or handling any of the claims Mr. Butler submitted under

the Policy.  Therefore, the Court finds there is no genuine dispute that HII has no

liability for the claims-handling counts.

Accordingly, Plaintiffs Second Motion for Partial Summary Judgment as to

HII should be denied, and HII's Cross-Motion for Summary Judgment should be

denied as to Counts III-IX and XIV, and granted as to Counts II and X-XIII.

## E.    Defendant NCE's Motion for Summary Judgment [Doc. 137]

NCE argues it is entitled to summary judgment on all claims asserted

against it because the evidence fails to show that NCE played any role in the

handling of Mr. Butler's claims, the marketing, sale or renewal of the Policy, or

that NCE is jointly liable for the alleged tortious conduct of the other Defendants.

Plaintiffs concede that NCE's motion should be granted as to the UTPA claim

(Count II), claims-handling claims (Counts X-XIII), and estoppel claims (Counts

VIII-IX).  Nevertheless, Plaintiffs argue summary judgment is not appropriate on

the common law claims related to the sale of the Policy (Counts III-VII), because

54

there are disputed questions of fact concerning whether NCE acted jointly with

NBoA.

1.   <em>Additional Facts Relevant to NCE's Motion</em>

NCE is a group association that offers several optional benefits to its

members, including insurance.  On April 14, 2015, NCE entered into a Program

Manager Agreement with HII and Xchange.  NCE asserts it is the group policy

holder for the Unified Short Term Medical program at issue in this case.  Plaintiffs

contend NCE is a group policyholder for Unified in some circumstances, but in

this case, it was the program manager.

As discussed above, Unified's compliance manager, Sandy Price, emailed

representatives from NCE and Xchange on January 13, 2016, notifying them that

"Unified would like to terminate all agent appointments associated with the

National Brokers of America agency and discontinue using this agency to sell

Unified products. . . . NCE and Xchange can discuss and determine next steps with

regards to the contracts with the agents/agencies."  (Doc. 134-6 at 2.)

On January 21, 2016, Ms. Price sent a follow-up email to NCE, Exchange,

and HII stating "I asked our Administration team for confirmation today that the

appointments had been terminated, but I found out they had not been terminated."

(Doc.134-6 at 4.)  Xchange responded, copying NCE and others, saying "we are in

the midst of retrieving all of the necessary information on which to base a

55

collaborative decision with regard to the agents in question.  Although we are inclined to term them based on what we have heard, we do not have all of the facts to make an informed decision."  (*Id.*)

On February 27, 2016, Mr. Corchado sold the Policy at issue in this case to Mr. Butler.  After purchasing the policy, Mr. Butler received a card which displayed NCE's logo, along with the phrase "Membership Card" and "NCEHealth.org."

On March 1, 2016, Ms. Price emailed HII, coping NCE and Xchange, stating "Please help me understand why these agents are continuing to sell for United after we requested the termination in January."  (Doc. 134-6 at 9.)  HII responded, copying NCE and Xchange, explaining "I checked my notes on the matter and, after your initial email describing the action taken against NBoA by Unified, further discussions were held with Xchange, NCE, HII, and Unified's Kevin Dill where the scope of the termination was discussed and limited to Allan Redmond & Brad Butler, who were responsible for the bulk of the sales & complaints."  (*Id.*)

2.   *NCE's Liability with Respect to Claims Relating to the Sale of the Policy*

It is undisputed that NCE was not involved in handling Mr. Butler's claims for benefits under the Policy.  But the parties dispute whether NCE may be liable for NBoA and Mr. Corchado's conduct in the sale of the policy.  Plaintiffs contend that NCE was responsible for training NBoA in the sale of Unified short-term

56

medical policies, that NCE was aware Unified had requested to terminate NBoA's agency appointment, and that NCE participated in a decision not to terminate NBoA and Mr. Corchado shortly before he sold the Policy to Mr. Butler.

As set forth above, a person is subject to liability for the harm to a third person from the tortious conduct of another if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. *Newman*, 272 P.3d at 633.

Here, Plaintiffs have pointed to sufficient evidence to raise a genuine issue of fact as to whether NCE knew of NBoA's conduct and substantially assisted or encouraged NBoA through its management, training, and/or participation in the decision not to terminate NBoA.  For example, Plaintiffs point out that according to Unified's compliance manager, Sandy Price, NCE was the program manager in this case:

> Q. What do they do for United?
>
> A. NCE is in this case the program manager.  In some cases they are the group policyholder for the plan.
>
>  (Doc. 163-1 at 2.)

Ms. Price further testified that NCE was responsible for training NBoA agents like Mr. Corchado.  Ms. Price testified:

> Q. Do you have some kind of guidelines that you provide to agents to ensure that they are providing complete and accurate information to potential policyholders when they sell your products?

57

A. Not to my knowledge.

Q. So you just depend upon the agents to tell the policyholder what they need to know?

A. The process is overseen by National Congress of Employers, NCE. It's my understanding they have training documents, that they work with the TPAs to ensure that they're acting appropriately.

Q. So it's your understanding that NCE is in charge of overseeing and providing guidelines to HII and its agents with respect to the products that it sold for Unified?

A. In some cases, yes.

(Doc. 163-1 at 3-4.)

Plaintiffs further note that based on the parties' email exchanges with Ms. Price in January and March 2016, it appears NCE was aware Unified had requested that NBoA be terminated as an agent. Ms. Price's first email directing termination was sent directly to both Chris Sabatella of NCE and Ned Brown of Exchange. (Doc. 134-6 at 2 ("Hi Chris and Ned,").) Her follow up email was likewise addressed directly to NCE, Xchange, and HII. (*Id.* at 4 ("Chris, Ned and Dan,").) Thereafter, NCE was copied on several communications relating to NBoA's termination. (*Id.* at 3-9.)

It also appears NCE participated in the decision to allow NBoA's agency to continue. In particular, on March 1, 2016, Dan Garavuso, Vice President of compliance for HII stated: "I checked my notes on the matter and, after your initial

email describing the action taken against NBoA by Unified, **further discussions were held with** Xchange, **NCE**, HII, and Unified's Kevin Dill where the scope of the termination was discussed . . ."  (Doc. 134-6 at 9 (emphasis added.)

Therefore, Plaintiffs have presented sufficient facts, taken in a light most favorable to the Plaintiffs, to create a genuine issue of material fact whether NCE knew of misconduct by NBoA in the sale of the policies, and provided assistance to NBoA in delaying its termination.

Therefore, summary judgment is not appropriate as to NCE on Counts III-VII, and XV, relating to the sale of the Policy.

Accordingly, NCE's Motion for Summary Judgment should be granted as to Counts II, and VIII-XIII; and denied as to Counts III-VII, and XV.

## III.   CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.     Plaintiffs' Motion for Partial Summary Judgment (Doc. 98) be **GRANTED in part and DENIED in part**;

2.     Defendants Allied and Unified's Motion for Partial Summary Judgment (Doc. 115) **be GRANTED in part and DENIED in part**;

3.     Defendants Allied and Unified's Motion for Partial Summary Judgment on Common Law Counts (Doc. 128) be **GRANTED as to Allied**, and **DENIED as to Unified**;

4.      Plaintiffs' Second Motion for Partial Summary Judgment (Doc. 125)

be **DENIED as to Unified/Allied**; and **DENIED as to HII**;

5.      Defendant HII's Motion for Summary Judgment (Doc. 132) be

**GRANTED in part and DENIED in part**;

6.      HII's Motion to Strike Plaintiffs' Notice of Supplemental Authority

(Doc. 209) be **GRANTED**.  Plaintiffs' Notice of Supplemental Authority filed at

Document No. 203 should be **STRICKEN**; and

7.      Defendant NCE's Motion for Summary Judgment (Doc. 137) be

**GRANTED in part and DENIED in part**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy

of the Findings and Recommendations of United States Magistrate Judge upon the

parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after service hereof, or

objection is waived.

**IT IS ORDERED**.

DATED this 9th day of August, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge